Maude T. FEARING, Petitioner,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 17177.

United States Court of Appeals
Eighth Circuit.

April 4, 1963.

Gordon D. Simons, Minneapolis, Minn.,
for petitioner.

Harry Marselli, Attorney, Tax Divi-
sion, Washington, D. C., Louis F. Ober-
dorfer, Asst. Atty. Gen., Washington, D.
C., Lee A. Jackson, Loring W. Post, Alan
D. Pekelner, Attorneys, Tax Division,
Washington, D. C., on the brief for re-
spondent.

Before SANBORN and BLACKMUN,
Circuit Judges, and STEPHENSON,
District Judge.

BLACKMUN, Circuit Judge.

This petition for review concerns the
taxpayer's right to dependency credits
(under the 1939 Code) and exemption
deductions (under the 1954 Code) for
two grandchildren for the income tax
calendar years 1953 and 1954. The is-
sue was decided adversely to the tax-
payer, T. C. Memo 1962–148, 21 T.C.M.

800, on the ground that she had "failed to sustain her burden of showing that she contributed more than one-half of the support" of the grandchildren for the years in question. There were also other issues resolved in favor of the Commissioner but these are not before us.

The governing statutes are § 25(b) (1)(D) and (3)(A) of the Internal Revenue Code of 1939, as amended, and §§ 151(a) and (e)(1) and 152(a)(1) of the Internal Revenue Code of 1954. They need not be quoted here except to observe that both § 25(b)(3) and § 152 (a) define "dependent" to mean any of a named group of persons, including grandchildren, "over half of whose support, for the * * * year * * * was received from the taxpayer."

The taxpayer, Maude T. Fearing, and her husband, Edward J. Fearing, resided in Hibbing, Minnesota, throughout 1953 and 1954 and filed joint federal income tax returns for those years. Mr. Fearing had suffered a stroke in 1950, was not in good health thereafter, found it necessary to retire in 1955 from his work as a mine supervisor, and died in 1958. Apparently no probate proceeding was necessary for his estate. Mrs. Fearing appears as the surviving taxpayer.

There is no real dispute as to the basic facts, as to the applicable legal standard, or as to the meaning of that standard. The controversy centers in the simple question whether contributions by the taxpayer and her husband in 1953 and 1954 constitute over half of the support of the two grandchildren in those years.[1] Because this case is essentially a factual one; because we have jurisdiction to review the tax court's decision "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury", § 7482(a) of the 1954 Code; because findings of the tax court are not to be set aside unless they are clearly erroneous, Loco Realty Co. v. Commissioner, 8 Cir., 1962, 306 F.2d 207, 209; because this rule "applies also to factual inferences from undisputed basic facts", Commissioner v. Duberstein, 1960, 363 U.S. 278, 291, 80 S.Ct. 1190, 1199, 4 L. Ed.2d 1218; G. W. Van Keppel Co. v. Commissioner, 8 Cir., 1961, 295 F.2d 767, 771; Estate of Smith v. Commissioner, 8 Cir., 1963, 313 F.2d 724; and because the burden rests upon the taxpayer to establish her right to a claimed deduction or exemption, Luehrmann's Estate v. Commissioner, 8 Cir., 1961, 287 F.2d 10, 15, our task here is that of determining whether the tax court's findings are supported by substantial evidence on the record as a whole and are not against the clear weight of the evidence or induced by an erroneous view of the law. Schoenberg v. Commissioner, 8 Cir., 1962, 302 F.2d 416, 419.

We therefore review the simple facts. The taxpayer's daughter, Mary June Krecklow, is the mother of the two grandchildren. Mrs. Krecklow and her husband were divorced in August 1950. During the taxable years in question Mary June and her children lived in a Minneapolis house owned and provided by the Fearings. She paid no rent for this occupancy. The home's rental value was $1,500 a year. Mrs. Krecklow received $100 a month from her divorced husband for the support of their children; in addition he contributed $78 in 1953 and $70 in 1954 for the children. The monthly payments were required by the divorce decree. The Fearings also

[1]. Regulations § 1.152–1(a) (2) (i). "For purposes of determining whether or not an individual received * * * over half of his support from the taxpayer, there shall be taken into account the amount of support received from the taxpayer as compared to the entire amount of support which the individual received from all sources * * *. The term 'support' includes food, shelter, clothing, medical and dental care, education, and the like. Generally, the amount of an item of support will be the amount of expense incurred by the one furnishing such item. If the item of support furnished an individual is in the form of property or lodging, it will be necessary to measure the amount of such item of support in terms of its fair market value."

sent Mary June $100 a month; they did not tell her how this was to be spent. The Fearings supplied the children with clothing worth $600 in each of the two years. They sent additional amounts of money when unusual expenses arose and they provided some clothing for Mary June.

Mrs. Krecklow had a babysitter living in her home. This girl received board and room and a salary and performed other duties in addition to baby sitting. Mary June was thus able to work. She earned $2,542.96 in 1953 and $2,290.55 in 1954. She testified that of her earned income she spent on herself "very little, a minimum", that she spent most of it on her children, that she did not know whether 90% of it went for the children and "I imagine it cost more than 10 per cent for me to live" but "everything I could possibly afford went to my children". Mrs. Krecklow used a part of the money received from her parents to pay heat bills and to replace the hot water heater and kitchen sink.

The grandchildren visited their paternal grandparents in Milwaukee for about six weeks in 1953 and for seven to eight weeks in 1954. The senior Krecklows supported them during these periods. Mary June testified that "I let them go so I could save this money so we could afford to spend it in the winter months". The children's father gave them money when they visited him.

Mary June commingled the money she received and, except for the minimum necessary for her personal needs, spent the entire balance on maintaining the household, boarding and paying the babysitter, and providing for her two children.

The Fearings claimed the grandchildren as dependents in their returns for 1953 and 1954. Mary June failed to file timely returns for herself for those years because there had been withholding on her salary and "I thought this was adequate". She testified that she was called to the tax office; that a return was made out for her there; that she signed it; that the two children were taken as dependents in those returns; that she received a refund; and that "at the time * * * I thoroughly believed I did [supply more than half of their support] and now I don't believe I did" because "it was pointed out to me by my parents' accountant that they paid for the rent".

We thus have a situation where both Mary June and her parents claimed a deduction for the two children and where the support for the children came from various sources.[2] In summary, the money and values flowing into Mary June's little family consisted of the following:

|  | 1953 | 1954 |
|---|---|---|
| Mary June's earnings | $ 2,542.96 | $ 2,290.55 |
| Mr. Krecklow's payments | 1,278.00 | 1,270.00 |
| Payments by Fearings | 1,200.00 | 1,200.00 |
| Total cash | $ 5,020.96 | $ 4,760.55 |
| Rental value of house supplied by Fearings | 1,500.00 | 1,500.00 |
| Value of children's clothing supplied by Fearings | 600.00 | 600.00 |
| Total | $ 7,120.96 | $ 6,860.55 |

In addition, in amounts and values not proved by the record, there were the summer support furnished the grandchildren by the paternal grandparents, the visitation payments made to the children by their father, the value of clothing given Mary June by her parents, and the emergency sums they sent to her.

Accepting the fact that all the incoming cash was consumed, it is evident from the above figures that the Fearings contributed less ($3,300) than half of the totals required to keep the entire household going. The difficulty, however, lies in the allocation of the several amounts among Mary June and her children.

■ Clearly Mr. Krecklow's payments and the clothing supplied the grandchildren by the Fearings are to be

---

2. It was not shown that any multiple support agreement, contemplated by § 152 (c) of the 1954 Code, and which apparently could have been utilized to some advantage here, Regulations § 1.152-3, was filed for 1954.

allocated in their entirety to the grandchildren. The father's money was received for the support of his children and Mary June testified that she spent that money on the children. These items aggregate $1,878 for 1953 and $1,870 for 1954. If two-thirds ($1,000) of the rental value of the house (obviously supplied for Mary June as well as for the grandchildren) and, despite Mary June's testimony as to partial use for certain other purposes, if all the Fearing monthly cash payments are allocated to the grandchildren, we have an additional $2,200 for them for each year. This produces a total of $4,078 for 1953 and one of $4,070 for 1954. Of each of these amounts, $2,800 was contributed by the Fearings. However, this leaves unallocated Mary June's earnings for each year. If the portion of those earnings properly allocable to her two children exceeds $1,522 and $1,530 for 1953 and 1954, respectively, then less than half of the support of the grandchildren was furnished by the Fearings. This is so because Mr. Krecklow's payments and Mary June's payments in each year would add up to more than the $2,800 supplied by the Fearings. In order to avoid this result, there would have to be available from Mary June's earnings for her own use amounts of more than $1,020.96 and $760.55, or more than 40% and 33% of her salary, for the respective years. But this does not square with her positive testimony that she used a minimal amount of her earnings for herself. If, furthermore, one is more realistic and allocates the monthly cash payments received from the Fearings equally among Mary June and the two grandchildren, the Fearing contributions for each year aggregate only $2,400 for the grandchildren ($600 plus $1,000 plus $800). The allocation to them from Mary June's earnings then need exceed only $1,122 for 1953 and $1,130 for 1954 in order to have the non-Fearing sources exceed the Fearing contributions. Avoidance of this result would require that more than $1,420.96 and $1,160.55,

respectively, of Mary June's earnings be used for herself, or approximately 56% and 51%. This is even more out of line and directly contradicts her own testimony that she spent the majority on the children. Thus, even on the former assumption, which is not warranted, that all the cash paid monthly by the Fearings to Mary June was used for her children, we find ourselves led inevitably to the conviction that the inferences which the tax court drew from the basic facts to support its conclusion that the taxpayer and her husband did not contribute more than half of the grandchildren's support during the taxable years in question were fully justified.

We may put it another way. We are not convinced, in any event, that the tax court's finding that the taxpayer did not contribute more than half of the grandchildren's support was clearly erroneous or that its conclusion that she has failed to sustain her burden of proof was improper. We need note only (a) the absence of proof of the amount of the grandchildren's total support; (b) the absence of proof of the value of the support furnished by the paternal grandparents; (c) the absence of adequate supporting financial records maintained either by the Fearings or by Mary June (admittedly there is an attempt to explain this away because of the illness of Mr. Fearing); (d) Mary June's claim of her children as dependency credits on her own returns and her realization of tax benefit in so doing; (e) her testimony that she used part of the Fearing cash to pay for household replacements "and many things"; and (f) her testimony that she used only a minimal amount of her own earnings for herself and spent "the majority" on her children. All these factors support the tax court's finding, afford substantial evidence for that finding, and prevent it from being clearly erroneous within the sense of either United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746, or Kauk v. Anderson, 8 Cir., 1943, 137 F.2d 331, 333.

The taxpayer in her brief places repeated emphasis upon the triviality of support items contributed by the father and his parents on the grandchildren's visits to them, on the personally beneficial character of items of this kind, and on the lack of cooperation and even bitterness which may exist between in-laws in the situation of a broken home. We make specific reference to these comments only to say that we are aware of the argument but are not persuaded by it here. We would not be concerned about the omission of truly trivial items from any computation. We think, however, that the children's stay with the paternal grandparents for more than one-twelfth of each taxable year is not a matter of de minimis despite the fact that visits of this kind are naturally anticipated and desired by grandparents and perhaps are not regarded by them as constituting the rendition of formal support. These were not occasional daytime visits. The applicable Regulations, footnote 1, supra, are specific.

■ Perhaps it is unnecessary to add the comment that this case presents the picture of a family group stricken by misfortune in the illness of Mr. Fearing; the illness of the Fearing son, a physician, with financial responsibilities for him and his family thrown upon the Fearings; and Mary June's domestic difficulty and her struggle to provide for her family. This, as are many others, is a case which naturally incites sympathy. But the income tax laws are congressionally created statutes of little flexibility. The Commissioner's duty is to enforce these laws as they are written. Neither the tax court, as a tribunal of primary jurisdiction, nor this court as a reviewing appellate body, has the power to stray from the provisions of the governing statutes only because a particular case presents hard facts.

Compare generally James H. Fitzner, 1959, 31 T.C. 1252; Bernard C. Rivers, 1960, 33 T.C. 935; Raymond M. McKay, 1960, 34 T.C. 1080; Aaron F. Vance, 1961, 36 T.C. 547; Grover A. Lycan, P-H T.C. Memo. 51077, CCH Dec. 18212

(M); Harry P. Justice Jr., 1958, T.C. Memo. 1958–109; Dallas Hall, 1958, T. C. Memo. 1958–10; Leo H. Rogers, 1962, T.C. Memo. 1962–178.

Affirmed.