**Edgar S. IDOL, Katherine G. Idol, and Speedway Transports, Inc., Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 17191.**

United States Court of Appeals
Eighth Circuit.

July 3, 1963.

Henry C. Lowenhaupt and Owen ,T. Armstrong (of Lowenhaupt, Mattingly,

---

Chasnoff, Freeman & Holland), St. Louis, Mo., for petitioners.

Norman H. Wolfe, Atty., Dept. of Justice, Washington, D. C., for respondent; Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attys., Dept. of Justice, Washington, D. C., on the brief.

Before SANBORN and BLACKMUN, Circuit Judges, and STEPHENSON, District Judge.

BLACKMUN, Circuit Judge.

The Tax Court has upheld deficiencies determined by the Commissioner in the 1956 and 1957 income taxes of Edgar S. Idol and his wife and in the 1955 and 1957 taxes of Speedway Transports, Inc. The court's opinion (not reviewed by the full court) is reported at 38 T.C. 444. The respective taxpayers have appealed.

The facts are complicated. Nearly all of them are stipulated. No basic fact is in issue. What is in dispute are the inferences and conclusions to be drawn from those facts. We are confronted with the questions (1) whether payments made by Speedway to Idol in 1956 and 1957 were upon a debt or, instead, are to be treated as dividends taxable to Idol; (2) whether a transfer of assets from Speedway to Cassens Transport Company in 1957 was in redemption of stock of Speedway or, instead, effected a sale with resulting long term capital gain to Speedway; and (3) whether that 1957 transaction also encompassed a dividend distribution from Speedway to Idol.

The facts are set forth in the Tax Court's lengthy and careful findings covering several pages of its report. It would serve no useful purpose to repeat those facts here in similar detail. It is enough if we emphasize only the following:

1. Speedway was a truck carrier transporting automobiles under rights granted by the Interstate Commerce Commission. In September 1953 H. F. Florman, through a nominee, owned all of Speedway's outstanding stock. This consisted of 90 capital shares.

2. That September Florman and Idol executed a "purchase contract" reciting that Florman sold all the Speedway stock to Idol for $10,000 plus an amount equal to the corporation's net worth as of September 30, and further reciting that Idol agreed to pay the purchase price in instalments through 1963 to be evidenced by an instalment note. Speedway's net worth on the date specified was later determined to be approximately $90,000. This contract was accompanied by an escrow agreement stating that Idol was depositing the certificates for the stock as a guaranty of his performance.

3. The 90 Speedway shares were registered in Idol's name on October 1, 1953, and the certificates were deposited with the escrow agent. The proposed promissory note, however, was never delivered to Florman. Idol served as president and as one of three directors of Speedway from October 1, 1953, to beyond May 1, 1957. Mrs. Idol was vice-president and director during the same period.

4. In January 1955 Speedway, with ICC approval, 60 M.C.C. 655, acquired a right to transport automobiles from Detroit to points in Missouri and Illinois. The parties called this the "Detroit franchise"; it was operated under contract with Chrysler Corporation. A year later Speedway also owned a right to transport automobiles from Kenosha, Wisconsin, to certain Illinois and Missouri points. This was the "Kenosha franchise"; it was operated under contract with American Motors Corporation.

5. By January 1956 Cassens, which was another interstate truck carrier of automobiles, indicated interest in acquiring the Detroit franchise.

6. In February 1956 the escrow agent received a letter signed by Florman, Idol and S. J. Cento (whose identity or interest is not otherwise revealed by the record) reciting that Idol had purchased all the Speedway stock "as of this date" for $112,500 ($1,250 per share) and directing the agent to deliver the escrowed shares to Idol upon receipt of his check for that amount within thirty days. At the same time Florman and Idol ap-

pended a statement to the 1953 contract reciting that "this agreement is cancelled by the purchase of the foregoing stock for $112,500.00".

7. A special meeting of Speedway directors was held February 23. The minutes recite that at this meeting

"(a) Idol stated that the 1953 contract was on terms not wholly satisfactory either to him or to Florman; that he had now agreed 'to complete the deal by paying a flat price of $112,500'; that in order to finance the transaction he had to find another buyer for a portion of the stock or the corporate assets; and that he had arrived at an agreement with Cassens to acquire the Detroit franchise and some equipment.

"(b) Idol also stated that consideration had been given to a complete liquidation of Speedway, his own purchase of the Kenosha franchise and equipment, and Cassens' purchase of the Detroit franchise and equipment, but that this procedure was discarded because of expense and delay and Florman's unwillingness to bind himself to an agreement dependent upon ICC approval.

"(c) Idol proposed to purchase 42 shares of Speedway himself with the understanding that Speedway would borrow $60,000 and buy the remaining 48 shares as treasury stock, and with the further understanding that Speedway would exchange the Detroit franchise and equipment for 36 shares of its stock to be acquired by Cassens from Idol after ICC approval.

"(d) The company authorized the borrowing of $60,000 from Idol, the use of the borrowed funds to acquire the 48 shares as treasury stock, and the execution of an agreement with Cassens for the Detroit franchise and equipment."

8. On February 28 Security Credit Company, a corporation controlled by the shareholders of Cassens, loaned Idol $112,500 against his instalment note. He deposited this sum in his personal bank account and promptly transferred $60,000 of it to Speedway. Florman was then paid $52,500 by Idol and $60,000 by Speedway. This effected payment to Florman in full for the Speedway stock.

9. On February 28 Florman transferred 42 shares of the Speedway stock to Idol and 48 shares to Speedway. Idol deposited the 42 shares with Security Credit as collateral for its loan to him. On March 1 Speedway delivered to Idol its instalment note for $60,000.

10. On February 28 Cassens, Speedway and Idol executed a "purchase agreement" providing (a) for Cassens' purchase from Idol of 36 Speedway shares for $45,000 ($1,250 per share) in cash within 10 days of ICC approval; (b) for Idol's and Cassens' voting their respective Speedway holdings "in favor of a partial liquidation of Speedway under which the 36 shares will be exchanged for" the Detroit franchise and equipment; (c) for Cassens' not participating otherewise in Speedway's management; and (d) for Cassens' not being responsible for Speedway's prior obligations.

11. In March Speedway and Cassens filed an application with the ICC for approval of the transfer of the Detroit franchise. A year later, on March 21, 1957, that approval was forthcoming. The Commission, however, reduced the scope of the franchise somewhat and authorized the parties to adjust the price downward. The 1956 agreement was then modified by reducing the number of Speedway shares from 36 to 32 and the cash from $45,000 to $40,000. The Commission's report recited that the method of sale was "devised because of tax considerations and it is not intended that [Cassens] at any time will acquire control of [Speedway] as a result of the temporary stock ownership", that the Commission's "consideration herein is on that basis, and vendee should not purchase the 36 shares of vendor's stock from Idol unless it intends to immediately relinquish them to vendor in payment for the

properties covered by the instant purchase".

12. Thirty-two Speedway shares were released by Security Credit and transferred from Idol to Cassens. Cassens paid $40,000 to Idol. Idol in turn paid this $40,000 to Security Credit to apply on his indebtedness to it. Speedway transferred the Detroit franchise and equipment to Cassens. Cassens transferred the 32 shares to Speedway which then held it as treasury stock. A bill of sale delivered by Speedway to Cassens recited the receipt of the 32 shares "in exchange for" the Detroit franchise and equipment. All this took place on May 1, 1957. Idol then owned only 10 shares of Speedway stock and these were on deposit with Security Credit; the remaining 80 shares were in the corporation's treasury.

13. In 1956 and 1957 Speedway made payments to or for Idol which it reflected on its books as payments of interest and principal on its note to him. Some of these were made direct to Idol; others were made to Security Credit on his behalf. Speedway at the time possessed earnings and profits sufficient to pay dividends in these amounts.

In its 1956 and 1957 returns Speedway claimed as deductions the amounts its books showed as interest paid to Idol or on his behalf. The Commissioner disallowed these deductions. He claimed that the payments were dividends to Idol from Speedway. He also claimed that Speedway realized capital gain on the transfer of the assets to Cassens in 1957 and that the $40,000 received by Idol from Cassens was a dividend to him from Speedway.

Judge Withey of the Tax Court agreed with the Commissioner. His analysis and reasoning are apparent from his opinion. That opinion speaks adequately for itself and need not be summarized here.

The taxpayers' position before us is that Judge Withey's conclusions were erroneous because of his fundamental misconception of the 1953 transaction between Florman and Idol. They argue that the 1953 agreement never became effective and that, as a consequence, it is wrong to conclude that there was no substance in the 1956 loan from Idol to Speedway or in the 1957 transactions.

On the issue of the Speedway payments in 1956 and 1957 the taxpayers argue that the ineffectiveness of the 1953 contract is evident from and is a result required by the facts (a) that the contemplated promissory note from Idol to Florman was never delivered; (b) that the 1956 ageement was not a modification of the 1953 contract but was a new agreement for a different price and with a new party, S. J. Cento; (c) that the very language of the 1953 contract was executory; (d) that Idol's voting control of Speedway before 1956 did not equate with ownership but was occasioned by Florman's then control of another carrier in the face of the prohibition of 49 U.S.C.A. §§ 5(2) (a) (i) and 5(4) against multiple control of carriers without ICC approval; (e) that Idol's status was no more than that of a trustee; (f) that both Florman and Cento reported sales of Speedway stock on their respective 1956 tax returns, evidence as to which was improperly excluded; and (g) that the Speedway stock was not acquired by Idol in 1953 "because he did not and could not pay for it". It is then said that, once it is seen that the 1953 contract was never effective, Speedway's borrowing of $60,000 from Idol served a corporate purpose because it was in its interest to facilitate the change in ownership of its stock and because a 1954 conviction of Florman for attempting to evade taxes due from his other carrier would have had an unstabilizing effect on its business. It is argued that the substance of the whole transaction was the division of Speedway's assets and operations; that Speedway became a new enterprise under new ownership; that the intent of the parties. was clearly to create an appropriate debt from Speedway to Idol; and that it was not unreasonable for Idol to limit his equity investment in Speedway to $52,500, the price of the 42 shares.

On the issue of the nature of the 1957 transactions the taxpayers argue that there were practical business necessities for the purchase of Speedway stock or its assets by a non-carrier such as Idol because otherwise ICC approval, not eagerly contemplated by Florman, would have been required, because a transfer of the Detroit franchise from Speedway to Idol and then from Idol to Cassens would have necessitated double expense and delay, and because a plan the same as that which the Commissioner claims to be the real substance here would have required ICC approval and the inconvenience of making funds available for Florman before such approval. Thus it is urged that what was done was the only practical way of reaching the ends desired by Idol, by Cassens, and by Florman and Cento; that tax considerations were not the motivating factor; and that the form employed reflected the true substance.

Whether payments made by a corporation are in actuality dividends and hence includable in the recipient's gross income, under §§ 61(a) (7), 316(a), and 301(c) (1) of the 1954 Code, has been held by this court to be a fact issue. Sachs v. Commissioner, 8 Cir., 1960, 277 F.2d 879, 881–883, cert. denied 364 U.S. 833, 81 S.Ct. 63, 5 L.Ed.2d 59. We have also held that whether a distribution by a corporation in redemption of stock is essentially equivalent to a dividend, within the meaning of § 302(b) (1) or its predecessor statutes, is a fact issue. Heman v. Commissioner, 8 Cir., 1960, 283 F.2d 227, 230–231; United States v. Carey, 8 Cir., 1961, 289 F.2d 531, 537.

■ The clearly erroneous standard and its accompanying rules apply, of course, to a finding by the Tax Court. Section 7482(a) of the 1954 Code, 26 U.S.C.A. § 7482(a); Rule 52(a), F.R. Cv.P.; Commissioner v. Duberstein, 1960, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218; Fearing v. Commissioner, 8 Cir., 1963, 315 F.2d 495, 496. If a finding is supported by substantial evidence on the record as a whole and is not against the clear weight of the evidence

or induced by an erroneous view of the law, it is not to be disturbed on appeal. Schoenberg v. Commissioner, 8 Cir., 1962, 302 F.2d 416, 419.

On the issue of constructive dividends we said, in Sachs v. Commissioner, supra, pp. 882–883 of 277 F.2d:

> "The motive, or expressed intent of the corporation is not determinative, and constructive dividends have been found contrary to the expressed intent of the corporation. The courts, as arbiters of the true nature of corporate payments, have consistently used as a standard the measure of receipt of economic benefit as the proper occasion for taxation." (footnote omitted)

And on the issue of essential equivalence we quoted with approval, in both Heman, supra, p. 230 of 283 F.2d, and in Carey, supra, p. 537 of 289 F.2d, an observation of the Tax Court that there is no sole decisive test but that among the guideposts are whether there is a bona fide corporate business purpose, whether the action was initiated by the corporation or by the shareholders, whether there was a contraction of the business, and whether there was a substantial change in proportionate stock ownership. We went on to say in the Carey case that "The net effect of the transaction is at least an important consideration in determining dividend equivalency". Cases from other circuits contain similar observations. See, for example, Ferro v. Commissioner, 3 Cir., 1957, 242 F.2d 838, 841–842; Ballenger v. United States, 4 Cir., 1962, 301 F.2d 192, 196–198.

■ We are aware, of course, that it is not always easy to distinguish between true substance and mere form. Form does have some weight and significance in tax law and the selection of one route over another to a desired end is often a critical choice and may serve validly to govern the tax effect of a transaction. Gregory v. Helvering, 1935, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596; Commissioner v. Tower, 1946, 327 U.S. 280, 288, 66 S.Ct. 532, 90 L.Ed. 670.

■■ Each tax case, however, has its own aura. What is before us here seems to concern something less than a selection between acceptable alternatives. We have in Speedway, first of all, a corporation wholly owned at the start by Florman and wholly owned at the finish by Idol, although the number of shares each possessed was not the same, and with a claimed momentary partial ownership by Cassens in the interim. But that partial ownership was an agreed—one might almost say manipulated—holding which was subject to the Idol-Speedway-Cassens restrictive agreement of February 28, 1956, and also subject to the limiting conditions of the then forthcoming ICC approval.

We have, secondly, in Idol a taxpayer desirous of acquiring Speedway or its assets, or at least a part of those assets, and not having funds with which to achieve his purpose. This necessitated financing. One way to meet the obligations of that financing was to dispose of some of the corporate assets, to operate only the remaining assets, and to extract funds from the corporation for application on the loan. To follow that route directly would entail capital gain to Speedway and dividend distributions taxable in their entirety to Idol.

We have, thirdly, in Florman a seller who, in his ownership of Speedway, concededly was in violation of the multiple holding prohibitions of the Interstate Commerce Act, Part I, and who had been convicted of attempted tax evasion. Although this uncomfortable posture of Florman may, as the taxpayers argue, be an indicator of something less than beneficial ownership of Speedway in Idol before 1956, it may be argued just as logically that it supports full ownership in Idol because it relieved Florman of his status of unauthorized multiple control.

We have, fourthly, in Cassens a carrier desirous of acquiring the Detroit franchise and equipment, having no aspiration to acquire, and in fact not permitted to acquire, any control of Speedway or of its operations, and having its 32 shares of Speedway only momentarily on that stock's passage from Idol to Speedway.

We have, fifthly, in Security Credit a Cassens controlled entity, willingly lending the funds needed by Idol, obtaining repayment of $40,000 of its loan as soon as Cassens had paid that amount to Idol, and seeing the desired franchise and equipment transferred to Cassens.

These circumstances do not appeal to us as' part of or as consistent with a genuine redemption, distinct from dividend equivalency, of the Speedway stock held by Cassens, or with a genuine debtor-creditor relationship between Speedway and its sole shareholder Idol. They convince us, as they did the Tax Court, that the real substance beneath the coating of complicated facts and imaginative argument was a sale by Speedway to Cassens and Idol's beneficial receipt of funds from his solely owned and controlled corporation by way of dividends. Idol's personal obligation to Florman was paid. Economic benefit to Idol, of the kind contemplated by Sachs v. Commissioner, supra, p. 883 of 277 F.2d, was achieved unaccompanied by the presence of a convincing business purpose for Speedway in its acquisition of stock thereafter held in its treasury.

We therefore conclude that there is substantial evidence to support the findings of the Tax Court and that those findings are not clearly erroneous.

Although the following cases are not, and cannot be expected to be, precisely the same factually as this one, we regard them as pertinent authority for the conclusion we reach here. Ferro v. Commissioner, supra, 3 Cir., 1957, 242 F.2d 838; Heman v. Commissioner, supra, 8 Cir., 1960, 283 F.2d 227; Wall v. United States, 4 Cir., 1947, 164 F.2d 462; Television Indus., Inc. v. Commissioner, 2 Cir., 1960, 284 F.2d 322; Thomas J. French, 1956, 26 T.C. 263. We regard Zenz v. Quinlivan, 6 Cir., 1954, 213 F.2d 914; United States v. Cumberland Public Service Co., 1950, 338 U.S. 451, 70 S. Ct. 280, 94 L.Ed. 251; Tucker v. Commissioner, 8 Cir., 1955, 226 F.2d 177; Ray Edenfield, 1952, 19 T.C. 13; John A.

Decker, 1959, 32 T.C. 326, affirmed, 6 Cir., 286 F.2d 427; Standard Linen Service, Inc., 1959, 33 T.C. 1; Edmund P. Coady, 1960, 33 T.C. 771, affirmed, 6 Cir., 289 F.2d 490; and Milton F. Priester, 1962, 38 T.C. 316, all urged upon us by the taxpayers, as clearly distinguishable on their facts and in their tone.

Affirmed.