FREDERIC G. KRAPF, JR. AND JUNE B. KRAPF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Krapf v. Commissioner
Docket Nos. 10809-75, 9261-76.
United States Tax Court
T.C. Memo 1978-138; 1978 Tax Ct. Memo LEXIS 375; 37 T.C.M. (CCH) 594; T.C.M. (RIA) 780138; April 11, 1978, Filed Robert E. Schlusser, for the petitioners. Frank Coyne and Carolyn M. Parr, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined deficiencies of $132,381 and $73,633 in petitioners' Federal income tax for the years 1970 and 1971, respectively. The issues for our decision are: (1) Whether amounts disbursed by Frederic G. Krapf Construction Company during 1970 and 1971 for the construction of a yacht constitute taxable dividends to Frederic G. Krapf, Jr., its president and controlling shareholder. (2) If so, whether petitioners omitted an amount in excess of 25 percent of the gross income stated in their return for 1970, thereby extending the statutory period of limitations on assessments for that taxable year to six years pursuant *376 to section 6501 (e). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Frederic G. Krapf, Jr. (hereinafter referred to as petitioner) and June B. Krapf (hereinafter referred to as Mrs. Krapf) resided in Wilmington, Delaware, at the time the petition was filed in this case, Petitioner and Mrs. Krapf timely filed joint individual income tax returns for the calendar years 1970 and 1971 with the Mid-Atlantic Service Center of the Internal Revenue Service, Philadelphia, Pennsylvania. Mrs. Krapf is a party in this proceeding solely because she joined with her husband in filing the joint returns. Petitioner and his three sons, Frederic G., @III, James and Thomas, are involved primarily in the construction industry. The Krapf construction business consists of several corporations: Frederic G. Krapf, Inc., the original business formed by petitioner's father; Frederic G. Krapf Construction Company *377 (hereinafter referred to as Krapf Construction); Middletown Construction Company (hereinafter referred to as Middletown Construction); North-South Construction Company (hereinafter referred to as North-South Construction); Frederic G. Krapf and Son, Inc. (hereinafter referred to as Krapf and Son); Innovators of Planners and Developers; and others. Through these corporations, the Krapfs have undertaken all aspects of construction projects from beginning to end. Innovators of Planners and Developers designs buildings and the other corporations construct them. Middletown Construction is licensed to operate in Delaware, North-South Construction is licensed to operate in Florida and Krapf Construction Company is licensed to operate outside Delaware. The construction techniques used by these corporations originated in England and Holland.One such technique is the Bison system of modular construction which was used to complete a high-rise dormitory in Delaware in record time. Other Krapf projects included constructing an antipollution plant in Louisiana, constructing a Marine studies facility for a Delaware university, offering to construct a state prison in approximately one-third *378 of the construction time projected by others, and operating large self-propelled barges for disposing of pollutants at sea. Petitioner also designed the pumps and electrical relays for a 125 foot university seagoing research vessel and served other parties as a consultant for the use of self-propelled barges. Krapf Construction has never bid on a project. Instead it presents a conceptual design idea to a customer and negotiates a price for the completed project. The negotiations are conducted with the customer's top executive with decision-making authority. A yacht is conducive to these negotiations because it removes the customer's executive from possible sources of interruption for sufficiently long periods to make a presentation. The yacht named the Krapfcandoit V is the most recent in a series of yachts used for such negotiations. The Krapfcandoit V is an 85 foot ocean-going vessel which is powered by two V-12 diesel engines, each 375 horsepower, driving twin screws through V-drives of petitioner's own design. The purpose of the V-drive design is to permit location of the engine room, which also was designed by petitioner, at the aft end of the vessel as opposed to midship. *379 The engine room itself incorporates a unique system of pumps, piping and valves designed by petitioner for greater safety and compartment flooding control. The vessel is equipped with every safety feature available for its type, including a double bottom, collision bulkheads fore and aft, full navigation equipment, radar and automatic pilot. The interior of the vessel also differs from the ordinary in that all accommodations are the same size, thereby offering equal comfort to all to prevent the possibility of slighting a business guest. For meeting purposes, the vessel has a salon approximately 12 feet wide by 15 feet long which opens out onto the back deck to provide an aggregate length of 25 to 30 feet with a large circular table. The total cost of the yacht was $365,089.30 of which $189,830.34 was paid during 1970 and $106,231.01 was paid during 1971. The word "Krapfcandoit," used as the name of the yacht, has been the trademark of the Krapf family businesses for over 60 years and was initiated by petitioner's father. The word "Krapfcandoit" is intentionally used by the Krapf businesses to convey to the public the message that those businesses have unique skills that permit *380 them to undertake projects which other businesses cannot undertake. "Krapfcandoit" appears on the various corporations, buildings and equipment, on the uniforms of company bowling teams, on business cards and on company flags flying over construction projects. The business telephones are answered by that name. As used on the vessel, "Krapfcandoit V" is painted in larger than usual red, white and blue letters across the entire transom on a drawing of a steel girder in billboard fashion. The commercial manner of painting the name on the vessel has caused a yacht club to expell the vessel from the club's moorings. The word "Krapfcandoit" also connotes personal and family pride and appears on many personal objects of petitioner such as his automobile. An abbreviated version of the word ("Cando") appears on petitioner's personal fishing boat, a 31 foot sport fishing Bertram which he co-owns with his youngest son. Prior to the construction of the Krapfcandoit V, petitioner personally owned seriatim four yachts which each bore the name "Krapfcandoit." These vessels were used for both business and personal purposes.Petitioner has been personally interested in yachts and boating for *381 as long as he can remember. Petitioner has belonged to the Northeast River Yacht Club since he was fifteen years old and more recently joined a yacht club in Tuscaloosa, Alabama. Petitioner's sons do not belong to yacht clubs and do not have the privilege of using petitioner's yacht club memberships. The yachts prior to Krapfcandoit V were not fully satisfactory for business since they had limited accommodations and lacked many safety provisions. The last had been sold in 1964 or 1965. Without the yachts, however the Krapf businesses were not making as many contracts. Petitioner also learned from acquaintances involved in chartering yachts that the chartering market was good and could be profitable. Acting in his capacity as president of Krapf Construction, petitioner investigated the possibility of acquiring a replacement yacht. Designs for a yacht to be made in the United States were drawn up but the plan was abandoned as too expensive. The impetus for the acquisition of the Krapfcandoit V arose subsequently as an opportunity to have it constructed as one of three identical yachts, thereby obtaining a better price. With the purchasers of the other two yachts petitioner *382 obtained designs and drawings of the vessels and obtained a construction estimate from a Holland boat-building company DeConrad, n.v. (hereinafter referred to as DeConrad). Petitioner had originally set up the contract to be between DeConrad and Middletown Construction, but changed the proposed contracting corporation when he realized that Middletown Construction was not licensed to do business outside of Delaware. In a meeting of its Board of Directors on March 20, 1969, Construction authorized petitioner to enter a contract with Jacob Langenberg, president of DeConrad, for the construction of a twin-screw, occean-going yacht at a price not to exceed $175,000. The minutes of the meeting state that the new boat was to replace one that "had been used in the past for the entertainment of customers and the meeting of new customers." Those present at the meeting of the Board of Directors which authorized this action included petitioner, who was the president and 59 percent shareholder; Mrs. Krapf; Frederic G. Krapf III, who was a 13.8 percent shareholder; and one Norman McDowell. The remaining outstanding shares of Krapf Construction were held in equal shares by petitioner's other *383 sons, James and Thomas. On March 31, 1969, Krapf Construction entered into a contract with DeConrad for the construction of the Krapfcandoit V at a price of $152,000, delivery to be made on or before July 1, 1970. In order to protect the corporation from liability associated with the yacht, on October 8, 1969, Krapf Construction on the advice of counsel incorporated a wholly-owned subsidiary, Krapfcandoit Marine Co. No. II (hereinafter referred to as Marine) and assigned the contract to it. Petitioner was the first president of Marine and Mrs. Krapf was its secretary-treasurer. On June 15, 1970, Frederic G. Krapf, III, was elected president in place of petitioner, who then became vice-president. Krapf Construction made capital contributions of cash to Marine for the yacht's construction. By October 31, 1972, advances to Marine totaled $365,089.30. Marine's books listed this amount as $1,000 for capital stock, $308,836 contributions to capital in excess of par value and $55,253.30 operating expense loan payable. The loan was repaid by Marine on May 4, 1973. During the construction of the yacht, DeConrad encountered financial and construction difficulties. By the end *384 of December 1969 the price of the yacht had been revised upward from the contract price to $180,961. Despite this increase, construction costs to the builder exceeded the revised contract price. On the original contract delivery date only the hull and rough interior iraming were complete. Although the builder subsequently never actually declared bankruptcy or had its property attached by creditors, petitioner feared that creditors of DeConrad might seize the yacht. He met with the other two yacht purchasers and Jacob Langenberg. It was decided that the yachts should be registered in the names of the respective purchasers and removed from Holland as soon as possible. Petitioner and Jacob Langenberg went to the American Consulate to have the Krapfcandoit V registered in the name of Marine. The Consulate declined to register the yacht in the corporate name, however, because petitioner did not have the requisite corporate formalities with him. Petitioner was concerned that the delay which would be required to obtain the corporate documents and seal would result in the yacht being seized by the creditors of DeConrad. Consequently, on February 1, 1971, petitioner registered the *385 Krapfcandoit V in his individual name. On his return to the United States on February 9, 1971, however, petitioner executed an affidavit stating that the yacht was and at all times had been the property of Marine. Although petitioner made several trips between the United States and Holland in the following two months, he did not secure the corporate seal and resolutions to change the registry of the vessel to reflect ownership by Marine. At the time of registration the yacht was still incomplete. In anticipation of removing the Krapfcandoit V from Holland at the earliest possible moment, liability and hull insurance were obtained on the yacht effective March 8, 1971, and April 1, 1971, respectively, with Marine named as the beneficiary. The yacht remained under construction in DeConrad's yards until it was sufficiently complete to be moved. At that time, April 24, 1971, a release needed to clear the harbor authorities was issued by DeConrad to Marine and on April 26, 1971, the yacht set out for Dover, England. Although the yacht was mobile, it was incomplete and left Holland with a carpenter, an electrician and a mechanic on board working on the yacht's interior. Others on *386 board included petitioner, Jacob Langenberg, a captain, a mate and three crewmen. The yacht stayed in Dover from April 26 through April 28, 1971, and took on ropes, lines, nails, varnishes and other finishing materials. It then set out for a boatyard in Spain for additional work, but on May 6 the yacht developed motor touble in the Bay of Biscayne and had to put in for repairs. The yacht then went on to Gibraltar and from May 12 through June 22, 1971, was in a boatyard in Mirabella, Spain. On May 16 the Dutch crew returned to Holland and several students were hired to do finishing work and cleaning. During this period the gangway, interior furnishings, the refrigerator, a stereo system, toilet vents and emergency lighting were installed. Petitioner returned to the United States on May 16 and left Mrs. Krapf with the yacht to try to get the vessel finished.The hired captain quit and left the yacht. When the school year ended, petitioner's youngest son joined his mother to help supervise the work and captain the ship. Petitioner returned to the yacht on June 23, 1971, and set sail for a boatyard in Naples, Italy, for additional work on the yacht, but became ill and was hospitalized *387 for an ulcer on the Island of Majorca. The yacht went on without petitioner and from July 9 through the end of August was in and out of the Naples boatyard where the following work was done: canvass and isinglass windows installed; general carpentry work completed; telephone system installed; work begun on davit; work done on electrical system and hydraulic winches; and painting.Petitioner rejoined the yacht for the period from August 6 to August 24 and October 2 to October 17. After unsuccessfully trying to have the vessel completed in Europe for almost a year, petitioner decided to have it finished in the United States and to forego attempts to charter the yacht in the Mediterranean. Starting on November 1, 1971, the yacht crossed the Atlantic Ocean to Barbados and then to St. Thomas in the Virgin Islands. Coming across the Atlantic the only instruments working properly were the automatic pilot, the sextant and the compass. A second son met the yacht in the Canary Islands. During the final leg of the crossing in early 1972, petitioner was present an additional 49 days, of which 14 were personal charter, 29 were corporate charter, and six were en route from the West Indies *388 to the United States. On April 23, 1972, the yacht arrived at Marine's docks in Wilmington, Delaware. Because of the variation in names between the prior registration and the harbor release, the United States Coast Guard declined to register the yacht in Marine's name without a master carpenter's certificate. Jacob Langenberg had prepared such a certificate in the name of Marine at the time the yacht left Holland, but did not give it to petitioner at that time. In the course of preparing for trial petitioner contacted Langenberg and obtained the master carpenter's certificate. The Krapfcandoit V was registered with the United States Coast Guard in the name of Marine on October 5, 1977. During 1972, the first year the yacht was rented, the only customers were Krapf and Son, Krapf Construction, and petitioner individually for the respective aggregate rentals of $38,000, $9,500, and $10,000. The net result was charter fees of $57,500 offset by expenses of $43,515, resulting in taxable income for Marine of $14,595 after accounting for some interest income. The Federal income tax on this amount was entirely offset by the investment credit.Krapf and Son and Krapf Construction claimed *389 and were allowed entertainment and expense deductions for the charter fees. For most years since 1972 Marine has continued to show a profit. One employee was hired by Marine to stay aboard the yacht at all times as a full-time mate. Since its purchase, the Krapfcandoit V has been used in conjunction with more than 50 percent of the contracts negotiated by or in performance by Krapf Construction and Krapf and Son. Among the contracts negotiated on board the yacht were contracts to sell a shopping center, to construct additions to it, to construct restaurants, to exchange tracts of land and build two new office buildings, and to build a new building for a liquor importer. Whenever the yacht was chartered to a Krapf company, either petitioner or one of his sons was on board.
The yacht has also been advertised for charter at the rate of $500 per day and occasionally has been chartered at that rate. When petitioner individually chartered the yacht for personal purposes, he paid the advertised rate. At the time of trial, petitioner's intention was to retire as head of the Krapf businesses in November 1977. His son, Frederic G. Krapf, III, has already succeeded him as president *390 of both Krapf Construction and Marine and has no plans to vary the use of the yacht by Marine. Petitioner timely filed both his 1970 and 1971 tax returns. On September 29, 1976, more than three years after the filing of petitioner's 1970 return, respondent issued a statutory notice of deficiency in the amount of $132,381 based on an alleged constructive dividend of $189,858 for disbursements to build the Krapfcandoit V. The actual amount of disbursements in 1970 for the yacht's construction has been stipulated to be $189,830.34. This amount is more than 25 percent of the amount of gross income reported by petitioner on his 1970 return. On September 24, 1975, respondent issued with respect to petitioners' 1971 return a statutory notice of deficiency in the amount of $73,633 based on an alleged constructive dividend of $107,131 for disbursements to build the yacht. The parties have agreed that the actual disbursement in 1971 was $106,231. The parties previously agreed to an extension of the period of limitations on assessments with respect to 1971 to December 31, 1975.
OPINION The primary issue for our decision is whether funds disbursed by Krapf Construction for the construction *391 of the yacht Krapfcandoit V constitute a constructive dividend to petitioner, the corporation's controlling shareholder. The yacht was built in 1970 and 1971 for Krapf Construction's wholly-owned subsidiary Marine with funds advanced to Marine by Construction as contributions to capital. Respondent contends that the purchase of the yacht was for the personal benefit of petitioner. Petitioner contends that the yacht was purchased for valid business purposes and that no constructive dividend to petitioner should be found. Cases dealing with the issue of constructive dividends resulting from corporate distributions are legion. See, e.g., Ross Glove Co. v. Commissioner,60 T.C. 569, 595 (1973); Dean v. Commissioner,57 T.C. 32, 40 (1971); Challenge Manufacturing Co. v. Commissioner,37 T.C. 650, 662-63 (1962). The law is well settled that a corporate disbursement may be held to be a dividend for tax purposes if made for the personal benefit of a shareholder rather than for a valid corporate business purpose. Rapid Electric Co. v. Commissioner,61 T.C. 232, 239 (1973); *392 Rushing v. Commissioner,52 T.C. 888, 893 (1969), affd. 441 F.2d 593 (5th Cir. 1971); Idol v. Commissioner,38 T.C. 444 (1962), affd. 319 F.2d 647 (8th Cir. 1963). If a corporate disbursement is made for the personal benefit of a shareholder, the amount includable in his income as a constructive dividend is the fair market value of the benefits which he received. Challenge Manufacturing Co. v. Commissioner,supra at 663; Rodgers Dairy Co. v. Commissioner,14 T.C. 66, 73-74 (1950). The burden of proof is on respondent to establish that petitioner omitted an amount more than 25 percent of the gross income reported on his 1970 return in order to extend the statute of limitations for that year to six years under section 6501(e). Philipp Bros. Chemicals, Inc. (Md.) v. Commissioner,52 T.C. 240, 254 (1969), affd. 435 F.2d 53 (2d Cir. 1970); Reis v. Commissioner,1 T.C. 9, 12-14 (1942), affd. 142 F.2d 900 (6th Cir. 1944). Although *393 the underlying facts are the same for 1971, the burden is on petitioner to prove that respondent's determination for that year is incorrect. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Both respondent's and petitioner's positions are supported by evidence in the record, but we conclude that on balance a preponderance of the evidence favors petitioner. We find that the disbursements for the Krapfcandoit V were not primarily for the personal benefit of petitioner and, in any event, the value of the benefit received by petitioner did not exceed that received in return in the form of services and cash rentals from petitioner and his family. Although petitioner had a life-long personal interest in boats, Construction had a substantial business purpose in constructing the Krapfcandoit V and we believe that any benefit to petitioner from the yacht's construction was merely incidental. In reaching this conclusion we are not unmindful that close scrutiny is appropriate for arguably personal expenditures by a closely-held corporation. See Baird v. Commissioner,25 T.C. 387, 393 (1955). Petitioner *394 was the controlling shareholder and chief executive officer of Krapf Construction as well as the other Krapf-controlled corporations and to some extent the personal desires and actions of petitioner were inseparable from those of his corporations. Prior to the construction of the Krapfcandoit V petitioner had personally owned four yachts which were used for both personal and business purposes. Without petitioner's personal interest in yachting, Krapf Construction probably would not have contracted for the purchase of the Krapfcandoit V. Despite this identity of interests, however, we think Krapf Construction's motivation in purchasing the Krapfcandoit V was primarily business-oriented. A constructive dividend does not result solely because a controlling shareholder may have the primary input into the decision underlying a corporate disbursement. See Joseph Lupowitz Sons, Inc. v. Commissioner,497 F.2d 862, 868 (3d Cir. 1974); Rushing v. Commissioner,supra at 894.Petitioner, Krapf Construction and Marine sufficiently complied with the formalities *395 necessary to separate corporate use from petitioner's personal use and charged petitioner the full charter rate for the latter. Under these circumstances petitioner should not be charged with a constructive dividend. The record demonstrates a need for a yacht to adequately conduct corporate business. After the Krapfcandoit IV was sold, Krapf Construction and the other Krapf corporations experienced a slow down in obtaining new contracts. The corporate conclusion that this was due to the lack of a yacht for business purposes appears to have been well-founded. Unlike most construction companies, Krapf Construction and the other Krapf corporations never bid on a job. Instead all contracts were individually negotiated with the customers' chief executives. The quiet isolation and atomosphere ofa yacht proved conducive to these negotiations. The Krapfcandoit V was especially designed to accommodate these negotiations with a large meeting room and with unusually large guest quarters.
Beyond providing pleasant surroundings, the yacht had a more direct and visible importance for negotiations with prospective customers. Its engine room, electrical relays and pump system were all of a *396 unique design created by petitioner. As such they provided tangible evidence to potential customers of the unique capabilities of the Krapf corporations.Consequently, the yacht facilitated negotiations which led to receiving both general construction contracts and contracts to design marine research facilities. Since its purchase, the Krapfcandoit V has been used in conjunction with more than 50 percent of the contracts of Krapf Construction and Krapf and Son. Moreover the yacht was also occasionally chartered to third parties. In light of these surrounding circumstances and credible testimony that business was suffering without a yacht, we are not prepared to second guess the business judgment that a yacht was necessary for Krapf Construction's business. In addition to the existence of a bona fide corporate business purpose, petitioner's position is supported by the absence of an identifiable fair market value to the personal benefit received. Whenever the Krapfcandoit V was used for petitioner's personal use, he paid the full rate at which the yacht was advertised and occasionally chartered to third parties. It was undoubtedly to petitioner's benefit to have the yacht, which *397 he sometimes used for personal purposes, to display his family and corporate slogan and to be owned by his corporations, but this benefit was incidental to the purchase of the Krapfcandoit V for valid corporate business reasons. The fact that a controlling shareholder may derive an indirect or derivative benefit is an insufficient basis on which to find a constructive dividend. Rapid Electric Co. v. Commissioner,supra at 239; Rushing v. Commissioner,supra at 894. Respondent places primary reliance on the irregularities in the registration of the Krapfcandoit V and the alleged personal use of the yacht for the first year after it was removed from Holland. We think that neither of these points requires a finding of a constructive dividend. The irregularities in the registration arose as a result of the exigencies of the moment. As the yacht was being constructed, the builder, DeConrad, was experiencing financial difficulties. Under the threat of potential seizure by creditors, petitioner attempted to register the yacht in the name of Marine *398 immediately. Since the American Consulate refused to register the yacht in the name of Marine without the corporate seal and resolutions, understandably petitioner chose to register the yacht in his own name as an interim measure rather than risk loss of the yacht by waiting until the corporate formalities could be supplied. Although the registration was thus initially held nominally by petitioner, previous and subsequent events establish that legal ownership actually resided in Marine. Preliminary investigations into the feasibility of constructing the yacht were made by petitioner in his corporate capacity and at an early stage a formal corporate resolution authorizing the purchase was made. After some confusion as to which Krapf corporation would contract for the boat's construction, the contract was executed between Krapf Construction and DeConrad. Petitioner was at no time individually a party to the contract. Krapf Construction subsequently incorporated Marine as a wholly-owned subsidiary and assigned the yacht contract to it to protect the parent corporation from any liability which might arise from the operation of the yacht. Thereafter, apart from petitioner's initially *399 registering the yacht in his own name to preclude the possibility of seizure during an otherwise unavoidable delay in registering the yacht, all the transactions in the record establish that the yacht was actually owned by Marine. Immediately upon returning to the United States petitioner executed an affidavit to that effect. All payments for the boat's construction came from Marine. The Master Carpenter's certificate listed Marine as the owner. Marine was named as the beneficiary of the insurance policies on the yacht. For chartering purposes Marine was held out to the public as the yacht's owner.Petitioner, Krapf Construction and Krapf and Sons each paid Marine for their use of the Krapfcandoit V. Admittedly petitioner was dilatory in obtaining the United States Coast Guard registration in Marine's name, but by the time of trial he had corrected that technical error. In our opinion the Krapfcandoit V was at all times owned by Marine. Nor do we believe that respondent was correct in characterizing the return of the yacht from Holland to the United States as a year-long cruise for the personal benefit of petitioner, his family and friends. The yacht was removed from Holland *400 before it was complete in order to insure that it was beyond the reach of DeConrad's creditors. The record is sketchy in places but for the most part it supports petitioner's position that the journey and delays en route were necessitated by attempts to complete the yacht and return it to America. It left Holland with a carpenter, an electrician and a mechanic on board to work on the yacht's interior. Construction materials were picked up in Dover and the yacht proceeded to the Mediterranean for additional work and for possible chartering if the yacht could be completed. After unsuccessful efforts to have the boat fully completed in boat yards in Spain and Italy, the yacht was returned to the United States via the West Indies. The places visited are of a nature generally associated with pleasure cruises but the circumstances of the visits preclude an inference that the journey was for petitioner's personal benefit. Whatever incidental benefit which may have inured to petitioner and his family was offset by substantial benefit to the corporation in services which aided the completion and return of the yacht. The record indicates that after the yacht's arrival in the West Indies *401 and subsequent return to the United States a conscientious effort was made to separate personal use from corporate use and to pay the appropriate charter fee. Moreover, rather than basing his deficiency for the amount of any unpaid fair market value for days of personal use, respondent contends that the full cost of the boat should be charged as a constructive dividend. Respondent relies on general allegations that the beneficial ownership lies in petitioner without sufficiently supporting those allegations with specific instances of uncompensated personal use. Even if we were to accept respondent's contention, which we do not, that the yacht was occasionally used for petitioner's personal benefit without compensation to the corporation, that would be insufficient to charge him with a constructive dividend of the full cost of the yacht's construction. Since Marine actually and effectively owned the Krapfcandoit V, the most petitioner could properly be charged with as a constructive dividend is the excess of the fair market value of benefit to petitioner over the amount remitted by petitioner to the corporation for his personal use of the yacht. Nicholls, North, Buse Co. v. Commissioner,56 T.C. 1225, 1240-41 (1971). *402 Our finding that petitioner fully compensated Marine for his personal use of the Krapfcandoit V precludes charging him with a constructive dividend of any amount, let alone for the full cost of the yacht's construction. Accordingly, we hold that the Krapfcandoit V was purchased for valid corporate business purposes and petitioner received no constructive dividend as a result of disbursements for the yacht's construction in 1970 and 1971. To reflect our conclusion herein, Decisions will be entered for the petitioners. Footnotes
1. Unless specified otherwise, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.↩