Old Dominion Plywood Corporation, et al. [1] v. Commissioner. Old Dominion Plywood Corp. v. Commissioner
Docket Nos. 209-64 - 212-64.
United States Tax Court
T.C. Memo 1966-135; 1966 Tax Ct. Memo LEXIS 148; 25 T.C.M. (CCH) 678; T.C.M. (RIA) 66135; June 20, 1966
John Y. Merrell, 844 Shoreham Bldg., Washington, D.C., and Paul P. Senio, for the petitioners. Eugene I. Meyers, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in the income tax of petitioners as follows for the indicated years: Petitioner
Docket No.
Year
Amount
Old Dominion Plywood Corporation
209-64
1961
$40,677.76
Cecil J. Stone, Sr. and Edna M. Stone
210-64
1960
39,818.17
1961
11,260.87
Cecil J. Stone, Jr. and Dorothy C. Stone
211-64
1960
5,963.31
1961
1,580.98
Walter A. Harkleroad and Mary E. Harkleroad
212-64
1960
1,912.42
1961
536.29
In his notice of deficiency addressed to the corporate petitioner in Docket No. 209-64, respondent *150 determined that a claimed bad debt deduction in the amount of $144,964.29 for 1961 was disallowed. This amount represented net advances made by the corporate petitioner to World Woods Corporation. Respondent also determined that interest income reported by petitioner Old Dominion Plywood Corporation in the amount of $9,689.26, with respect to these advances should be eliminated from taxable income. In its petition, the corporate petitioner alleged that the advances in question were made for "valid and compelling business reasons, were bona fide in every respect and were intended to be loans by the parties to the transaction." In an amended petition, corporate petitioner alleged in the alternative that in the event it is determined that the funds advanced were not loans, then, petitioner should have been allowed a business loss or business expense for the year 1961 in the amount of $144,964.29. In his notices of deficiency addressed to the individual petitioners, respondent determined that they had received taxable dividend income from the corporate petitioner in the following amounts and for the indicated years. Amount
of Taxable
Petitioner
Docket No.
Year
Dividend Income
Cecil J. Stone, Sr. and Edna M. Stone
210-64
1960
$70,527.08
1961
30,317.83
Cecil J. Stone, Jr. and Dorothy C. Stone
211-64
1960
16,304.16
1961
6,980.22
Walter A. Harkleroad and Mary E. Harkleroad
212-64
1960
6,082.79
1961
2,586.34
*151 These proceedings have been consolidated for hearing and opinion. The issues presented for our decision herein are: (1) Whether the corporate petitioner is entitled to a bad debt, business loss, or business expense deduction of $144,964.29, or any part thereof, for the year 1961, arising out of the unpaid advances made by it to World Woods Corporation; and (2) Whether the three male individual petitioners who were stockholders of Old Dominion Plywood Corporation received any dividend income from the corporate petitioner during the years 1960 and 1961. Findings of Fact Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein and made a part of our findings by reference. Petitioner Old Dominion Plywood Corporation (sometimes hereinafter referred to as Old Dominion or petitioner) was organized on January 2, 1946, under the laws of the State of Virginia, with its principal office and place of business in the city of Bristol, Virginia. It kept its books and filed its tax returns on the accrual method of accounting and on a calendar year basis. Old Dominion filed its Federal corporation income tax *152 return for the taxable year 1961 with the district director of internal revenue at Nashville, Tennessee. The individual petitioners in Docket Nos. 210-64, 211-64, and 212-64, Cecil J. Stone, Sr. and Edna M. Stone, Cecil J. Stone, Jr. and Dorothy C. Stone, and Walter A. Harkleroad and Mary E. Harkleroad, respectively, are husband and wife, respectively, and all reside in Bristol, Tennessee. They filed joint Federal income tax returns for the taxable years 1960 and 1961 with the district director of internal revenue at Nashville, Tennessee. The individual male petitioners were all (and still are) shareholders of the corporate petitioner. The original capital stock of Old Dominion consisted of 1,000 shares of no-par common stock and 1,000 shares of $100 preferred stock. All of the original issue of common stock was held by Cecil J. Stone, Sr., until sometime in 1947. The preferred stock was issued to Cecil J. Stone, Sr., and pledged by him to certain customers of the corporation to secure a loan. A sinking fund was created by the corporation for the redemption of its preferred stock and all of the preferred stock was redeemed by 1953. From its beginning through December 31, 1961, the *153 common stock of Old Dominion was held by the following stockholders in the indicated amounts: Stockholder
1947-1949
1950
1951
1952-1955
1956-1960
1961
Cecil J. Stone, Sr.
1,000
950
915
890
690
4,830
Cecil J. Stone, Jr.
0
20
40
50
160
1,120
Walter A. Harkleroad
0
20
30
40
60
420
Sherman T. Gilmer
0
10
15
20
30
210
Jane S. Simpson
0
0
0
0
60
420
Issued:
1,000
1,000
1,000
1,000
1,000
7,000 [1]
*154 Cecil J. Stone, Jr., is the son and Jane S. Simpson is the married daughter of Cecil J. Stone, Sr. Walter A. Harkleroad and Sherman T. Gilmer are not related to Cecil J. Stone, Sr., Cecil J. Stone, Jr., or Jane S. Simpson. The percentages of stock in Old Dominion which each of the petitioners Cecil Stone, Sr., Cecil J. Stone, Jr. and Walter A. Harkleroad owned during 1960 and 1961 were 69 percent, 16 percent, and 6 percent, respectively. The directors of Old Dominion Plywood Corporation during the years 1958 to 1961, inclusive, were as follows: 1958 to 1960, inclusive Cecil J. Stone, Sr. Walter A. Harkleroad Cecil J. Stone, Jr. Sherman T. Gilmer 1961 Cecil J. Stone, Sr. Walter A. Harkleroad Cecil J. Stone, Jr. Sherman T. Gilmer Lela R. Horton The officers of old Dominion Plywood Corporation during the year 1958 to 1961, inclusive, were as follows: 1958 and 1959
President
Cecil J. Stone, Sr.
Vice-President
Walter A. Harkleroad
Treasurer
Cecil J. Stone, Jr.
Secretary
Sherman T. Gilmer
1960
Chairman of the Board
Cecil J. Stone, Sr.
President and Treasurer
Cecil J. Stone, Jr.
First Vice-President
Walter A. Harkleroad
Second Vice-President and
Secretary
Sherman T. Gilmer
1961
Chairman of the Board
Cecil J. Stone, Sr.
President and Treasurer
Cecil J. Stone, Jr.
First Vice-President
Walter A. Harkleroad
Second Vice-President and
Secretary
Sherman T. Gilmer
Assistant Secretary
Lela R. Horton
*155 Petitioner Old Dominion Plywood Corporation was engaged during the years in question in the manufacture of hardwood plywood, a product which is made by gluing various layers of wood (cross-plies) on both sides of a center layer, or core, with a decorative layer of wood, or face ply, placed on the one side of the assembly and another layer placed on the other side. In the manufacturing process, each layer is glued with its grain at right angles to the grain of the adjacent layer in order to minimize warpage and add strength to the plywood assembly. The face or exterior ply is the part of the plywood which is intended to be seen when the plywood is used in construction. Since the most expensive wood is only used for the outside ply, its decorative effect can be achieved at a much lower cost because of the use of cheaper woods for the inner layers and core. Petitioner had used three types of wood as cores in its manufacturing process. These were poplar lumber core, flakeboard (chip) core, and redwood lumber core. Poplar is the most widely used lumber for core because its warpage is minimal, and it is an inexpensive wood with good supplies existing in eastern Tennessee and southwestern *156 Virginia. Poplar lumber core is manufactured from sawn poplar lumber which is kiln-dried, reduced to narrow strips, and edge glued to the required dimensions. The core is then planed to the desired thickness, and the surfaces are made perfectly smooth. Flakeboard core is manufactured by grinding a log into flakes or chips and then gluing them into a flat piece of wood. Although it is cheaper than poplar core, it is not as useful because the large amount of glue makes it heavy and unable to hold screws. Moreover, its surface would not adhere as well to other woods as poplar core. Redwood core is also inferior to poplar core because it has a tendency to develop swellings or depressions on its surface, thus making it less suitable for use. The manufacturing process for redwood lumber core is substantially the same as that of poplar lumber core. There are two basic types of plywood manufactured in the industry: stock panel plywood and architectural plywood. The former is made in standard sizes and varieties and stored in warehouses for distribution. The latter is a product made to the size, color, and grain specifications of an architect, and is made by following the blueprints of *157 the installation site. Old Dominion sells its stock panel plywood principally to plywood distributors (wholesalers) located through the United States, who in turn sell plywood to lumber-yards and other retailers. The purchasers specify the type of core, back and face (outside surface) to be used in the manufacture of the plywood sold to them. Petitioner manufactures some of the rotary-cut plies, such as the cross-plies and the backing material, which are raw materials used in the manufacture of plywood. However, no lumber core has been produced by Old Dominion because its requirements were not large enough to warrant the establishment of lumber core production. It was not possible for petitioner to manufacture lumber core with the machinery it owned because the operation is completely different from that of the manufacture of plywood. While both processes involve the gluing of wood, lumber core requires edge gluing of thick strips of wood, and plywood principally requires flat laminate gluing of thin sheets of wood. The acquisition of adequate supplies of lumber core had been a severe problem to Old Dominion almost from its very inception. From 1946 until sometime in 1949, the *158 Bristol Door and Lumber Company of Bristol, Virginia, supplied petitioner with lumber core. It then stopped selling core to Old Dominion because it no longer could make any money on lumber core. After terminating its relationship with the Bristol Door and Lumber Company, petitioner began to buy lumber core from the Virginia Woodworking Company (hereinafter sometime referred to as Virginia Woodworking), a corporation located in Bristol, Virginia. Even after Virginia Woodworking began to supply petitioner with cores, the problem of a lumber core source was frequently discussed by both the stockholders and the directors of petitioner. In 1953, an attempt was made by Old Dominion to acquire a controlling interest in Virginia Woodworking so as to ensure the existence of a reliable source for cores. One of the reasons which prompted petitioner to make this offer was that there was an ever-present danger that Virginia Woodworking would cease manufacturing lumber core for Old Dominion. However, an offer to purchase Virginia Woodworking was rejected. In 1955, Old Dominion began to acquire more business in the realm of architectural and special construction plywood. In order to maintain this *159 type of business, petitioner required a local source for lumber cores to which it could rapidly transmit specifications and receive deliveries soon thereafter. Because 15 to 25 percent of its business was dependent upon the acquisition of lumber cores which would be made to specifications, petitioner became extremely anxious to obtain a reliable local source of these cores. In late 1958, Old Dominion experienced a price increase in lumber cores sold to it by Virginia Woodworking. Although this was not the first increase in prices from this source, petitioner had been able to absorb such increases in the past. However, at this occasion it became necessary for Old Dominion to increase its prices, and the result was a decrease in demand from its customers. Shortly thereafter, petitioner attempted to develop a source of supply of lumber core in Colorado, but after one or two shipments this new source terminated the production of such cores. At this time petitioner also had to plan for the possibility of its own plant being torn down because of the construction of a new highway. The projected cost of a new site and erection of a new plant was estimated at $550,000, and it was expected *160 that funds might have to be borrowed from outside, as well as local sources. In November 1959, the management of Virginia Woodworking Company notified petitioner that it had decided to discontinue the manufacturing of lumber core. However, because Virginia Woodworking realized that it constituted the sole source of lumber core for Old Dominion, it expressed a willingness to continue to manufacture core for petitioner until the latter could develop another satisfactory source of supply. It was imperative that petitioner find another source of supply soon thereafter because it feared that it would lose many of its customers for other plywood products, unless it could be assured of a supply of lumber cores for architectural plywood. Petitioner believed that if its customers were forced to go to another plant for architectural plywood, they would also buy their stock plywood elsewhere. Upon receipt of this notice from Virginia Woodworking, petitioner began immediately to seek other sources of lumber core. Virginia Woodworking Company supplied petitioner with a list of ten to fifteen of its competitors, but petitioner was unable to find any concern which would meet its requirements. *161 Moreover, petitioner approached Bristol Door and Lumber Company, its former supplier, but it was only willing to manufacture stock lumber core. At this time, Old Dominion offered financial assistance to both Virginia Woodworking and Wright Industries, Inc. (a local company, sometimes hereinafter referred to as Wright) if they would manufacture stock and architectural core, but these offers were refused. After these efforts failed, petitioner considered establishing a separate department within its own plant for the manufacture of lumber core. However, it was concluded that such a plan was not feasible because there was not sufficient space in the existing facilities for such an operation, and the core requirements of Old Dominion were not sufficient to support an entire lumber core manufacturing enterprise. [2] Consequently, it would have been necessary to sell lumber core to other competing plywood manufacturers, who might have suspected that petitioner would be favoring itself as to price, quality of manufacture, and delivery schedules. *162 Under these circumstances and after protracted consideration by the officers and directors of Old Dominion, it was decided that the most feasible way in which the critical problem of finding a source of supply of lumber core could be solved would be the organization of a new corporation which should manufacture such lumber core. On or about February 1, 1960 and during the consideration of this supply problem by the officers and directors of Old Dominion, Wright Industries, one of the local concerns which had previously refused to manufacture core for Old Dominion, indicated to Old Dominion that it would be willing to lease its plant and some of its equipment which would be suitable for the manufacture of lumber core. Thereupon, three of the principal stockholders of Old Dominion decided to form a corporation to manufacture lumber core for the purpose of supplying the needs of Old Dominion with the understanding that the new corporation would receive necessary financial support from Old Dominion. These were Cecil J. Stone, Sr., Cecil J. Stone, Jr. and Walter A. Harkleroad, the individual petitioners in this proceeding. This new corporation was World Woods Corporation (hereinafter *163 sometimes referred to as World Woods), and it was organized on February 19, 1960, under the laws of the State of Tennessee. Its principal office and place of business was in Bristol, Tennessee, the community which adjoins Bristol, Virginia. World Woods kept its books and filed its first corporate income tax return for its taxable year ended March 31, 1961, and its second and final income tax return for the period April 1 to November 30, 1961, with the district director of internal revenue at Nashville, Tennessee. On February 27, 1960, World Woods entered into a 3-year agreement whereby it leased the plant and equipment of Wright Industries at a monthly rental of $600 to take effect on June 1, 1960. The lease also provided for renewal at the option of the lessee for an additional 3-year term at a monthly rental of $1,250. Moreover, as part of the consideration for the lease agreement, World Woods acquired an option to purchase the property prior to March 1, 1963, at the price of $125,000. Appended to the lease was a detailed list of numerous pieces of machinery covered in the agreement. The charter of World Woods Corporation provided for the issuance of a maximum of 4,000 shares *164 of common stock at $50 par value. It also stated that the amount of capital with which the corporation would begin business would be $5,000, represented by 100 shares of $50-par-value stock. In fact, the initial capital was greater. During the period of its existence, the officers, directors, and stockholders of World Woods were as follows: Shares
of Stock
Cecil J. Stone, Jr.
72
President, Director
Cecil J. Stone, Sr.
72
Secy.-Treasurer, Director
Walter A. Harkleroad
72
Vice-President, Director
Total Number of Shares
216 The stockholders contributed $50 per share for a total capital contribution to the corporation of $10,800. This $10,800 capital contributed by the three stockholders to World Woods was borrowed from Old Dominion and at some later date was repaid to Old Dominion with interest. Such amount constituted the initial deposit to the bank account of World Woods Corporation which was maintained in the First National Bank of Bristol, Bristol, Tennessee. The $10,800 deposit was made on March 25, 1960. At the time of the formation of World Woods, another stockholder of Old Dominion, Sherman T. Gilmer, was invited to invest in the new corporation. *165 However, he declined to do so. At the time of the formation of World Woods Corporation in February 1960, it was clear to its three shareholders and to Old Dominion that it was going to need some additional funds above the intial $10,800 capital outlay. As early as February 29, 1960, the president of Old Dominion (Cecil J. Stone, Sr.) anticipated a need for additional funds by World Woods before the leased plant could be made operational. He reported to the stockholders of Old Dominion on that date as follows: In our contracts with them, [World Woods] they are willing to cooperate with us and re-equip and convert that plant to the manufacture of lumber cores for us here, including our specialized items, architecturals, etc., and to attempt to do so at competitive figures for such production. They do, however, lack a goodly portion of the necessary capital to do so as they will be needing some costly modern machinery, which will be very necessary, for an efficient production of our needs. They have expressed a willingness to make such expenditures and equip their plant to our production. Our Directors feel it would be to the best interests of our firm to enter into an agreement *166 with them whereby we would supply them with the needed capital in turn for their guarantee to furnish to us such needed lumber cores and other materials for our production here, and to take such collateral as might deem necessary for the consumation [consummation] of such agreement. On April 4, 1960, at a meeting of the board of directors of Old Dominion, the following resolution was passed: RESOLVED that the officers of this company be and they are hereby authorized to execute the contract, dated May 1, 1960, in the form submitted at this meeting with World Woods Corporation authorizing this company to advance as loans certain funds necessary for the operation of World Woods Corporation and agreeing to purchase a portion of its manufactured products at market price as therein provided. After further investigation, the three stockholders of World Woods decided to construct an almost fully automated lumber core plant. This program included a fingerjoint operation, a process wherein different strips of wood are glued together endwise in order to obtain core of especially great length. On April 27, 1960, World Woods entered into a machinery purchase agreement with Brooks Machinery *167 Company, Inc. of Martinsville, Virginia (hereinafter sometimes referred to as Brooks). Brooks was a commission agent for a number of machinery and equipment manufacturers. The total price for the machinery covered in the agreement was $106,882, which was to be paid in the following manner: $30,018 upon shipment and the balance payable in 48 monthly installments, the first 4 at $1,000 and the remaining 44 at $1,656. The payments were to begin one month after shipment. Title to the machinery was to remain in Brooks until all payments were made. The installment obligations were evidenced by 48 negotiable promissory notes of World Woods payable to Brooks Machinery, all bearing interest at the rate of 6 percent per annum. Old Dominion was requested by Brooks Machinery and the First National Bank of Martinsville and Henry County in Martinsville, Virginia, to endorse the notes. After consideration of this request by the board of directors of Old Dominion, the notes were so endorsed and were discounted by Brooks at a bank. On May 1, 1960, World Woods Corporation entered into an agreement with Old Dominion Plywood Corporation. This agreement provided as follows: THIS AGREEMENT made and *168 entered into this 1st day of May, 1960, by and between WORLD WOODS CORPORATION, a Tennessee corporation qualified to do business in the State of Virginia, party of the first part, and OLD DOMINION PLYWOOD CORPORATION, a Virginia corporation, party of the second part. WHEREAS, the party of the first part has leased certain property located at the southwest intersection of Euclid Avenue and Commonwealth Avenue, Bristol, Virginia for the purpose of establishing and operating a plant for the manufacture of wood products, including lumber cores for plywood, and is in need of capital for the purchase and installation of machinery, purchase of raw materials, payment of wages, and other purposes incident to such operation, and WHEREAS, the party of the second part is willing to advance to the party of the first part from time to time the necessary funds in an aggregate amount not exceeding $70,000.00, with the understanding that the party of the second part shall have the first call or preference in filling of orders for lumber cores for plywood, and any other materials which the plant is capable of producing, in such amounts and at such times as the party of the second part may order *169 the same. NOW, THEREFORE, it is agreed between the parties hereto as follows: 1. The party of the second part will advance from time to time in such amounts as may be needed or required by the party of the first part, funds needed for the purchase and installation of machinery and equipment, or raw materials and payment of the costs of manufacturing, each of such payments to be evidenced by a note executed at the time of advancement, signed by the party of the first part, payable to the order of the party of the second part on demand, bearing 5% interest from date and to be paid or curtailed as hereinafter provided. 2. The party of the first part agrees to manufacture and sell to the party of the second part such lumber cores for plywood and other materials which the plant is capable of producing, in such reasonable amounts and at such reasonable times as the same may be ordered by the party of the second part, by written orders dated at least two weeks before the time of delivery, and to give to the party of the second part first priority and preference for the manufacture of the same in its schedule of operations. 3. The prices to be charged by the party of the first part *170 for such lumber cores for plywood and other materials which the plant is capable of producing, as may be ordered by the party of the second part shall be the prevailing market prices at the time of delivery, and each such order shall be invoiced by the party of the first part to the party of the second part at such prices, less 2% discount if paid in 10 days from the date of delivery. 4. From the net amount payable on each invoice after allowance of 2% discount, the party of the second part shall deduct 10% which shall be applied to the note or notes above described, in the order of the respective dates of such notes. 5. During the term of this agreement the party of the first part agrees that it will not increase the salaries of any of its officers or stockholders in effect at the date of the execution of this agreement without the written consent of the party of the second part; that it will pay no dividends to its stockholders; and that it will not encumber its machinery, equipment or material in process, except by deferred purchase money liens and that upon the written request of the party of the second part it will execute and deliver to the party of the second part a chattel *171 mortgage or deed of trust on its machinery and equipment, securing the unpaid balance of any note held by the party of the second part. This agreement shall be in effect for a period of one year from the date hereof and will be automatically renewed for additional periods of one year unless either of the parties shall within 60 days of the expiration of such one year period give notice to the other that it does not desire to renew the said contract. In the event such notice is given by either party to the other, any balance owing by each of the parties to the other shall become due and payable and the accounts between them shall be settled and any amount unpaid, including the balance of any notes, shall be paid within 30 days after such notice is given. The "priority and preference" phrase in the second paragraph of the agreement was intended to apply only to service and delivery. The "prevailing market prices" referred to in the third paragraph of the agreement was intended to be a price at which World Woods would sell the lumber cores it produced to any of its customers, with no preference for Old Dominion. World Woods was planning an operation which would produce approximately *172 10,000 to 12,000 square feet of lumber core per day. It was contemplated that Old Dominion's maximum requirements would be about 10 percent of such anticipated production. World Woods intended to sell the remaining portion of its production to other customers. Petitioners and World Woods had reason to believe that many of the former lumber core customers of Wright Industries and Virginia Woodworking would be willing to purchase their needs from World Woods. On June 9, 1960, World Woods purchased from Wright Industries certain raw materials, inventories, and supplies located on the premises leased from Wright. The total purchase amounted to $29,529.78. The following entries were made in the general journal of World Woods with respect to the purchase of the above items from Wright Industries: June 9, 1960
Debit
Credit
Raw materials (lumber on yard)
$14,845.96
Inventory - Work in Process (lumber in mill)
5,435.79
Inventory - Finished Products (casket shells, etc.)
6,591.86
Accounts Payable - Wright Industries
$26,873.61
June 9, 1960
Inventory - Supplies
$ 2,656.17
Accounts Payable - Wright Industries
$ 2,656.17
On June 14 and 17, 1960, World Woods *173 paid Wright the full $29,529.78, with respect to the purchase of the raw materials, inventory and supplies. The following entries appear in the general journal of World Woods: June 14, 1960
Debit
Credit
Accounts Payable - Wright Industries
$15,000.00
1st National Bank
$15,000.00
June 17, 1960
Accounts Payable - Wright Industries
$14,529.78
1st National Bank
$14,529.78 Although World Woods was given the right to pay for the inventory supplies as it used them it chose to pay for them in full, using funds advanced by Old Dominion. Of the total amount of $29,529.78 expended, $14,845.96 was for lumber stock, $12,027.65 was for casket shells, frames and related items, and $2,656.17 represented the purchase of miscellaneous supplies. Old Dominion could not use, and was not in the business of selling, casket shells or frames. On or about August 15, 1960, World Woods Corporation entered into an agreement for the purchase of certain machinery from Moore Dry Kiln Company of Jacksonville, Florida. World Woods made a down payment of $1,810, which represented 25 percent of the contract price of $7,242, and it issued a series of 35 notes at $151 and one note of *174 $146 to Moore Dry Kiln Company. All of the notes were executed on August 15, 1960, and were due serially at one month intervals for the 36-month period. These notes did not contain any endorser's signature. Although Brooks Machinery promised an August 1 delivery of the order placed by World Woods in April 1960, only part of the machinery was delivered on time. As a result, World Woods could not fulfill its expectation of having the new machinery in operation by the end of September or early October. The remainder of the machinery was not delivered until November or December. When the machinery began to arrive in August 1960, space limitations in the Wright plant were such that it became impossible to use the machinery which it already had in place. As a result, it was decided to close down the existing machine line and start tearing out the old line of machines in order to make room for the new equipment. It was also decided at a special meeting of directors of World Woods held on August 29, 1960, that if there was too much delay in obtaining the missing machinery, the customers would have to be notified that World Woods could not supply them with their needs until such time as *175 its equipment was operational. Since each part of the ordered equipment was to occupy a specific place on an automated assembly line, the machinery could not be set up until it was all received. The machinery never functioned at full operation, but it was put into partial operation by the end of December 1960. However, when the partial operation of the machinery was begun, it was discovered that it did not function properly. From December 1960 until February 1961, several engineers and other representatives connected with the machinery manufacturers came to the World Woods' plant and attempted to make the machinery function properly. During this period there was virtually no production at the plant. However, their efforts met with little success, and the plant never achieved its planned capacity. Only on two or three days did the production of World Woods reach 5,000 square feet. The new machinery which World Woods purchased from Brooks could only produce lumber cores, and could not be used for the manufacture of any other type of core or casket shells. World Woods intended to use the machinery leased from Wright for the manufacture of casket shells. Pursuant to action taken by the *176 board of directors of World Woods at a special meeting held on August 22, 1960, a line of credit was opened by World Woods with the First National Bank of Bristol, Bristol, Tennessee. The board's authorization was for a credit line of $40,000 "to be used for various functions of the corporation such as repairs to machinery, etc., payrolls, inventories, machinery and other needed purchases, etc., * * *." On October 20, 1960, World Woods borrowed $25,000 from the First National Bank of Bristol, Bristol, Tennessee, and executed its note bearing interest at the rate of 6 percent per annum in such amount due on January 18, 1961. This note was renewed on the due date and extended to April 18, 1961. On April 18, 1961, a renewal note with respect to the $25,000 loan was executed, and such note was due on July 17, 1961. Both the original note and the renewal notes were endorsed by Cecil J. Stone, Sr., at the request of the bank. The notes were endorsed as follows: We, the undersigned indorsers, hereby waive presentment, demand for payment, protest, notice of protest and dishonor, and bind ourselves according to the terms of the within contract. /s/ Cecil J. Stone, Sr. On July 17, 1961, World *177 Woods paid $25,000 to the Bank in repayment of the October 20, 1960, loan in that amount, as renewed. Apart from this $25,000, no other loans or advances were made to World Woods by anyone except Old Dominion. During the calendar year 1960, Old Dominion made eleven separate advances to World Woods on the following dates and in the following amounts: Date of Advance
Amount of Advance
June 14
$15,000
June 17
15,000
June 20
8,000
July 8
10,000
October 6
5,000
October 11
10,000
October 20
5,000
November 9
10,000
November 17
8,000
December 9
5,000
December 30
5,000 As evidence of these advances, World Woods gave Old Dominion instruments recording the amount of the advance, and the due date for repayment which was in all such cases 90 days (or on occasion 3 months) from the date of the advance. Interest at the rate of 5 percent per annum was provided in each instrument. The amount of each advance was recorded on the "Notes Payable" ledger sheets of World Woods and on the "Notes Receivable" ledger sheets of Old Dominion. From June 24 through December 31, 1960, 10 percent of the amount of the invoice price of each purchase made and paid for by Old *178 Dominion from World Woods during that year was credited on the books of the parties pursuant to paragraph 4 of the May 1 agreement. Both World Woods and Old Dominion treated the credits in their records as reductions in the total amount of the advances made to World Woods by Old Dominion. The following schedule shows the total amount credited in 1960 against the eleven separate advances made by Old Dominion in 1960: Amount of
Credits in 1960 Against
Date of Advance
Advance
Amount Advanced
(1) June 14, 1960
$15,000.00
June 24, 1960
$ 3.75
July 28, 1960
89.34
August 9, 1960
42.03
August 15, 1960
4.87
August 17, 1960
22.67
August 22, 1960
5.31
August 25, 1960
18.01
August 29, 1960
41.68
September 7, 1960
37.94
September 12, 1960
1.11
("interest rebate")
October 11, 1960
35.18
October 20, 1960
41.68
October 25, 1960
21.00
October 28, 1960
71.54
December 12, 1960
23.11
(2) June 17, 1960
15,000.00
None
(3) June 20, 1960
8,000.00
September 21, 1960
3.75
September 17, 1960
.33
("interest rebate")
December 15, 1960
22.51
(4) July 8, 1960
10,000.00
None
(5) October 6, 1960
5,000.00
December 27, 1960
146.11
December 30, 1960
15.75
(6) October 11, 1960
10,000.00
None
(7) October 20, 1960
5,000.00
None
(8) November 9, 1960
10,000.00
None
(9) November 17, 1960
8,000.00
None
(10) December 9, 1960
5,000.00
None
(11) December 30, 1960
5,000.00
None
*179 Apart from these, "credits" made against the total amount of the advances by means of the 10 percent invoice discount method, no other amounts were paid by World Woods to Old Dominion in repayment of the advances during 1960. When the advances became due under the terms of the various instruments, these instruments were renewed for an additional period of time corresponding to the initial terms without formal action by the directors or shareholders of either Old Dominion or World Woods. There was no provision in the May 1, 1960 agreement with respect to the renewal of the advances, nor were there any references to their renewability in the instruments themselves. At a special meeting on November 1, 1960, the board of directors of Old Dominion voted unanimously to authorize an increase in the funds which could be advanced to World Woods from $70,000 to $100,000. At this time, Old Dominion's tolal advances to World Woods were in the gross amount of $68,000. On November 14, 1960, World Woods Corporation entered into an agreement with R.B.M. Company, Inc., of Knoxville, Tennessee, for the purchase of certain machinery in the total amount of $2,374.05. The corporation executed a conditional *180 sales contract and made an initial payment of $593.55 on that date, and paid three consecutive monthly installments of $593.50 beginning December 14, 1960. The entire balance was paid in full on February 10, 1961. During the period January 1 through November 30, 1961, Old Dominion made the following advances of funds to World Woods: Amount of
Date of Advance
Advance
(1) January 9, 1961
$10,000.00
(2) January 27, 1961
2,500.00
(3) February 3, 1961
2,500.00
(4) March 21, 1961
4,000.00
(5) March 31, 1961
2,000.00
(6) April 7, 1961
2,000.00
(7) April 14, 1961
3,500.00
(8) April 28, 1961
2,000.00
(9) May 5, 1961
1,000.00
(10) May 10, 1961
1,200.00
(11) May 19, 1961
2,000.00
(12) May 26, 1961
1,000.00
(13) June 2, 1961
200.00
(14) June 9, 1961
500.00
(15) June 10, 1961
200.00
(16) July 1, 1961
1,000.00
(17) July 17, 1961
$25,000.00
(18) July 19, 1961
2,000.00
(19) August 1, 1961
600.00
(20) August 10, 1961
400.00
(21) August 17, 1961
100.00
(22) August 21, 1961
1,000.00
(23) September 1, 1961
600.00
(24) September 19, 1961
1,400.00
(25) October 19, 1961
2,000.00
Of the 25 advances made by Old Dominion to World Woods *181 in 1961, 4 advances [3] were recorded in the "Notes Payable" ledger of World Woods and in the "Notes Receivable" ledger of Old Dominion at the time each was made. These 4 advances were also recorded on instruments given to Old Dominion by World Woods reciting due dates of 90 days or 3 months and interest at the rate of 5 percent per annum. The remaining 21 advances were recorded at the time they were made on the "Accounts Payable - Old Dominion Plywood Corp." ledger sheet of World Woods. No contemporaneous instruments were issued by World Woods to Old Dominion to record these latter advances (except possibly the $200 advance of June 2, 1961), although the Stones were under the impression that they were so recorded. However, on June 2, 1961, a debit in the amount of $7,778.76 was made on the "Accts Payable - Old Dominion Plywood Corp." ledger sheet of World Woods, and a corresponding credit was entered in its "Notes Payable" ledger, and an instrument was issued on that date by World Woods to Old Dominion in the same amount setting forth a due date of 3 months and an interest rate of 5 percent per annum. The face amount of this instrument comprises part of the claimed deduction of $144,964.29, *182 herein at issue. From January 1, 1961 through March 17, 1961, 10 percent of the amount of the invoice price of each purchase made and paid for by old Dominion from World Woods was debited to the "Notes Payable" account of World Woods. Similar corresponding entries were made on the books of Old Dominion and were treated by both corporations as reductions in the outstanding amounts of the advances made by Old Dominion to World Woods. The following schedule shows the total amount of the reductions made in 1961 against the various advances made by Old Dominion through March 17, 1961: Amount of
Credits in 1961 Against
Date of Advance
Advance
Amount Advanced
(1) June 14, 1960
$15,000.00
None
(2) June 17, 1960
15,000.00
None
(3) June 20, 1960
8,000.00
None
(4) July 8, 1960
10,000.00
None
(5) October 6, 1960
5,000.00
None
(6) October 11, 1960
10,000.00
January 3, 1961
$ 61.69
January 9, 1961
67.56
(7) October 20, 1960
5,000.00
January 11, 1961
50.87
(8) November 9, 1960
10,000.00
January 23, 1961
62.35
January 27, 1961
63.38
January 31, 1961
77.69
(9) November 17, 1960
8,000.00
None
(10) December 9, 1960
5,000.00
February 17, 1961
16.19
February 21, 1961
26.53
March 6, 1961
16.50
March 10, 1961
215.51
March 17, 1961
113.78
(11) December 30, 1960
5,000.00
None
(12) January 9, 1961
10,000.00
None
(13) January 27, 1961
2,500.00
None
(14) February 3, 1961
2,500.00
None
*183 March 17, 1961, was the last date on which the 10 percent credit on sales to Old Dominion was applied in reduction of the total amount of advances outstanding between Old Dominion and World Woods. After this date, Old Dominion purchased lumber cores and miscellaneous items in March, April, and May of that year, and miscellaneous items from June through October. These post-March 17 purchases consisted of sixteen separate transactions having a total dollar volume of $10,864.90. Of this amount, $6,992.34 represented miscellaneous items other than lumber core, such as raw material lumber and office supplies and $3,872.56 consisted of lumber core sales. The 10 percent discount was not applied with respect to any of these latter sales. At the first annual meeting of the stockholders of World Woods held on February 20, 1961, the problems incident to the delay in the machinery deliveries were discussed. With regard to this matter, the president, Cecil J. Stone, Jr., made the following statement at that time: As a result of these late deliveries, and mcahinery [machinery] malfunctions, we have been unable to operate the plant for the last six months with any efficiency at all. In fact *184 our down time, as a result of these events, has resulted in our loss of the majority of our customers for our product, and a sizeable sum in labor, etc. which has been necessary in attempts to get the equipment in the production line to function properly. I estimate the delays in getting this line of machinery to us, and the malfunctioning of the line, has cost our company $50,000.00, plus an inestimable sum as a result of the loss of our good customers. * * * At this meeting, the shareholders authorized the officers and directors of World Woods to take whatever steps necessary to collect the damages it sustained as a result of the late deliveries, the machinery malfunctions, and the failure to deliver all the machinery as contracted. The attorneys of World Woods were directed to decide upon a course of action with regard to this matter. The attorneys ultimately reported that the alleged liability ran to the manufacturers of the machinery, rather than to Brooks Machinery. Because these parties were located in various parts of the country, World Woods was advised by counsel that the bringing of the necessary separate law suits would be costly and impractical. Hence, such a course *185 of action was abandoned. Old Dominion made all the advances to World Woods in 1960 and 1961 unsecured by any collateral. Each of the documents recording the advances were renewed for an additional period equal to the original terms of the instrument without specific action by either the directors or shareholders of Old Dominion. Such renewals were made as late as November 17, 1961. Moreover, Old Dominion did not exercise the right granted it under clause 5 of the May 1, 1960 agreement, to give notice to World Woods that it did not want the contract renewed. Giving of this notice would have made the amounts owed Old Dominion by World Woods due within 30 days. Because of the failure of the engineers to adjust the line of machinery in the World Woods' plant by the end of February 1961, it became clear that the corporation could not succeed as a venture. Both Walter A. Harkleroad and Cecil J. Stone, Jr., were aware of this fact sometime during February or March 1961. Cecil J. Stone, Sr., also became doubtful that the assembly plant would operate properly in "[late] winter or early spring" of 1961. During the period March 23, 1960, to August 16, 1961, Old Dominion executed 13 notes *186 in favor of the First National Bank of Bristol, Bristol, Tennessee. Each of these notes was due after a term of 90 days and each carried an interest rate of 6 percent per annum. The following is a list of the execution, due dates, and amounts of these notes: Date Executed
Due Date
Amount
(1) March 23, 1960
June 21, 1960
$20,000
(2) June 20, 1960
September 18, 1960
10,000
(3) June 21, 1960
September 19, 1960
20,000
(4) July 8, 1960
October 6, 1960
15,000
(5) September 18, 1960
December 17, 1960
10,000
(6) September 19, 1960
December 18, 1960
20,000
(7) October 6, 1960
January 4, 1961
10,000
(8) December 17, 1960
March 17, 1961
25,000
(9) January 17, 1961
April 17, 1961
10,000
(10) March 17, 1961
June 15, 1961
25,000
(11) April 17, 1961
July 16, 1961
10,000
(12) June 15, 1961
September 13, 1961
25,000
(13) July 16, 1961
October 14, 1961
10,000 Cecil J. Stone, Sr., endorsed each of the 13 notes executed by Old Dominion in favor of the Bank. Some of the funds were used by Old Dominion in its advances to World Woods. At a special meeting of the directors of World Woods held on April 7, 1961, it was decided that the losses which *187 the corporation sustained through the curtailment and shutdown of the operations due to the machinery failures made it necessary to arrange for a permanent disposition of the inventories and equipment. Various courses such as bankruptcy, attempts at resale or leasing, and public sale were discussed but no definite decision was taken at that time. By a unanimous decision it was further agreed to dismiss all the personnel of World Woods, except the firemen and watchmen which were necessary for the protection of the property. The most valuable asset which was in the possession of World Woods was the machinery, which it had agreed to purchase at a cost between $130,000 and $140,000. Because it was all new equipment which had been operated less than 30 days, Cecil J. Stone, Jr., believed, on or about April 1, 1961, that it had a value in excess of $100,000. The repurchase of the machinery was discussed with Brooks Machinery, and initially Roy Brooks of that company offered to pay approximately $95,000 for all the machinery and equipment of World Woods. This offer contemplated that the unpaid balance on the machinery, approximately $68,000, would be deducted from the above figures. However, *188 when World Woods indicated that it would accept such a figure, Brooks Machinery withdrew the offer. Later, World Woods offered to sell the machinery to Brooks for the unpaid balance of the remaining notes on it, but Brooks did not respond to this offer. In the summer and fall of 1961, the World Woods' machinery was advertised in a national magazine, but no offers resulted from this effort. Apart from the machinery, World Woods wished to dispose of some 50,000 to 60,000 feet of lumber inventory. At at regular meeting held on September 9, 1961, the board of directors of World Woods considered three offers for this lumber and accepted the offer of Old Dominion to buy the inventory for $52 per thousand feet. Although its price was slightly lower than a competing offer, it was accepted because Old Dominion did not insist upon inspection of the lumber on a board-by-board basis. This inspection process would have obligated World Woods to supply the requisite handling labor. On the afternoon of the same day, the board of directors of World Woods met at a special meeting in order to arrange for a final disposition of the machinery and equipment. At that time, it was proposed by the chairman, *189 Cecil J. Stone, Jr., that "some sort of an offer on all the machinery and equipment, balance of inventories, etc." be made to Old Dominion. Pursuant to this suggestion, Walter A. Harkleroad presented the following motion which was unanimously passed: As our corporation is defunct with no further funds available, and in order to shut off all expenses at the earliest moment in order to avoid forced bankruptcy, that we offer the directors of Old Dominion Plywood Corporation all the equipment consisting of that package of equipment purchased from Brooks Machinery Company and the package purchased from the Moore Dry Kiln Company, together with the air compressors, the R-177 double Planer and all other equipment, except the small glue mixer and the panel saw which can be returned to Brooks Machinery Company to settle the account which they have outstanding against us on these items of $833.00, also offer them the small amounts of inventories which are left in the plant, as follows: If Old Dominion Plywood Corporation will agree to remove all the above equipment and inventories by our deadline date of October 15th, and assume the notes of our company to the Moore Dry Kiln Company which *190 are outstanding as of that date, that all this be offered to Old Dominion Plywood Corporation for the outstanding balances of the Brooks Machinery notes plus the Moore Dry Kiln notes with Old Dominion assuming the interest against the notes from October 1st. The amounts, if I have them correctly, will be Brooks $62,928.00 and Moore $3,468.00 making a total of $66,396.00. Further, inasmuch as Old Dominion has helped us to move a good portion of our inventories by taking them off our hands, I move we offer them the remaining inventories for their removal at a figure of $2,775.00. All above to be subject to our lease settlement with Wright Industries which figure we ask Old Dominion to also assume as a deduction from these items. Two days later, the directors of Old Dominion met at a special meeting to consider the proposal of World Woods. The minutes of this meeting state in part: The directors of World Woods have reported to us that because of the long shut-down of that operation, that the corporation is defunct and must be voluntarily liquidated and quickly, or it will be forced into involuntary bankruptcy. They have explained that all further expenses of that plant must be stopped *191 completely quickly, and in order to move out and stop the continuing expenses of watchmen, lease, etc., they must dispose of the machinery, equipment and inventories without further delay. In response to this situation, the following proposal was unanimously accepted by the directors of Old Dominion: (1) Old Dominion would take over the machinery, equipment, and salvageable electrical apparatus of World Woods at a figure of $66,396. This amount represented the total sum owed to Brooks Machinery Company and Moore Dry Kiln Company on the machinery. In addition, this figure contemplated the fact that World Woods would make the payments due on the notes in favor of both these concerns in September 1961. (2) Old Dominion would take over the remaining inventory of casket shells and lumber of World Woods at a figure of $2,775. (3) Old Dominion would assume a lease settlement with Wright Industries in the approximate amount of $4,000 and deduct such amount from the value of the machinery and equipment taken over by Old Dominion. (4) World Woods would turn over to Old Dominion two accounts receivable in the total amount of $366.70. (5) In exchange for a note from World Woods, Old *192 Dominion would assume the payment of the accrued interest to October 1, 1961, owing from World Woods to Brooks Machinery Company and Moore Dry Kiln Company. The amount of this accrued interest was $4,368.59. In September 1961, World Woods Corporation made a payment to Brooks Machinery Company, Inc., on its note of $1,656, due September 18, 1961, plus interest of $91.08. It also made a payment to Moore Dry Kiln Company on its note of $151, plus interest of $9.82. Thereafter, World Woods Corporation owed Brooks Machinery Company, Inc., $62,928 and Moore Dry Kiln Company $3,468 on the principal amounts of notes issued to purchase machinery. Old Dominion Plywood Corporation agreed to take over certain equipment of World Woods Corporation and assumed all existing liabilities of that corporation, including the liability for the settlement of the lease of World Woods Corporation with Wright Industries, Inc. On September 12, 1961, the board of directors of World Woods met to consider the offer made by Old Dominion to take over the equipment and assume the liabilities. A motion to accept Old Dominion's proposal was unanimously adopted. As a result of the completion of these negotiations, *193 Old Dominion Plywood Corporation entered the machinery and equipment on its books at a cost of $66,396, which represented the total of the outstanding obligations on the machinery. The separate amounts were $62,928 due Brooks Machinery Company and $3,468 due Moore Dry Kiln Company. Old Dominion Plywood Corporation made efforts to sell this equipment and machinery after acquiring it from World Woods Corporation. By April 30, 1965, Old Dominion Plywood Corporation had sold the equipment and machinery acquired from World Woods Corporation. The net amounts realized from the sales of such equipment in the years indicated are as follows: Year
Amount
1962
$29,300
1963
0
1964
31,500
1965
6,500
Total
$67,300
The sales of equipment and machinery exceeded the recorded basis thereof to Old Dominion by $904, which excess has been entered on the books and records of Old Dominion Plywood Corporation as income in 1965. This amount was realized by selling the machinery piece by piece. While the machinery was in its possession, Old Dominion kept it in dead storage, and none of it was ever used. The machinery was new and in good condition, but the individual pieces would *194 not work together in an automated assembly line. At the time of trial, all of the machinery and equipment had been sold, except for two or three conveyors which have only scrap value. The agreement between World Woods and Old Dominion for the assumption of the former's existing liabilities was carried out according to the initial proposal made by World Woods with the exception that the liability on the lease to Wright Industries was settled for $2,000. Consequently, on November 30, 1961, a credit entry of $2,000 was made in the "Accounts Payable - Old Dominion Plywood Corp." ledger of World Woods, reflecting that amount due to Old Dominion from World Woods as a result of Old Dominion assuming the lease settlement with Wright Industries. All creditors of World Woods, other than Old Dominion, were paid in full. On November 1, 1961, an entry was made in the general journal of World Woods reflecting the transfer of its inventory to Old Dominion at a figure of $2,775, pursuant to the agreement between the two corporations. This figure was entered as a debit to the "Notes Payable (ODP Corp.)" account of World Woods and was applied as a reduction of the total outstanding advances made *195 by Old Dominion to World Woods. An instrument purporting to be a note was issued by World Woods to Old Dominion on October 1, 1961, in the amount of $4,368.59. That figure represented the accrued interest through October 1, 1961, on the notes in favor of Brooks Machinery and Moore Dry Kiln Company. This account was assumed by Old Dominion under the terms of its September 1961 agreement with World Woods. The latter treated the transaction in its general journal by debiting "Interest Paid" in the amount of $4,368.59 and crediting "Notes Payable (ODP) due 1/1/62" in that amount. Old Dominion included the $4,368.59 as interest income in its 1961 income tax return. [4] This amount comprised part of the claimed bad debt deduction of $144,964.29 at issue in this proceeding. *196 On November 30, 1961, the Notes Payable account of the general ledger of World Woods Corporation showed a balance due Old Dominion Plywood Corporation of $145,260.78. At that time Old Dominion had acquired all assets and assumed all existing liabilities of World Woods. Prior to December 31, 1961, World Woods became entitled to a credit of $296.49, which was applied as a reduction to the amount shown as due in the above-designated account to Old Dominion and such resulting balance of $144,964.29 was claimed as a bad debt deduction in the corporate income tax return filed by Old Dominion for the calendar year 1961. Old Dominion made the advances to World Woods prior to March 21, 1961, for the purpose of obtaining a source of supply of lumber core needed in its business. It made the advances to World Woods on and after March 21, 1961, (with the exception of the advance on July 17, 1961) and assumed certain of its obligations for the purpose of permitting the orderly liquidation of the assets of World Woods without the forced sales incident to bankruptcy or foreclosure proceedings in order to realize as much as possible therefrom and thus minimize the losses incident to the advances *197 theretofore made. It made the advance of $25,000 to World Woods on July 17, 1961, used by the latter on the same day to pay its note to the First National Bank of Bristol, for a dual purpose: (1) in order to preclude any action by the Bank against World Woods which would adversely affect the amount hoped to be realized from the orderly liquidation of its assets, and (2) in order to relieve Cecil J. Stone, Sr., from personal liability thereon as an endorser. On November 14, 1961, the three stockholders of World Woods Corporation, Cecil J. Stone, Jr., Walter A. Harkleroad, and Cecil J. Stone, Sr., met and declared their desire to surrender the charter and to dissolve the corporation. The formal dissolution occurred on December 21, 1961. During its existence, World Woods had approximately 10 customers to whom it sold its products. As of November 30, 1961, World Woods' balance sheet showed the following: Assets
Cash
$ 400.64
Total Assets
$ 400.64
Liabilities and Capital
Bonds, notes and mortgages pay-
able (maturity less than 1 year
from date)
$145,260.78
Other current liabilities - Taxes
99.15
Capital stock
Common stock
10,800.00
Earned surplus
(155,759.29)
Total liabilities and capital
$ 400.64
*198 World Woods' income tax return for its fiscal year April 1, 1961 to November 30, 1961, reveals the following information: Gross receipts less returns and al-
lowances
$33,322.04
Less: Cost of goods sold
46,884.78
Gross profit
(13,562.74)
Total gross income
(13,562.74)
Total deductions
33,224.97
Taxable income
(46,787.71)
During its fiscal year ended March 31, 1961, World Woods sold the following amounts of lumber core, casket frames and miscellaneous items (moulding, lumber, etc.): Lumber core
$67,860.95
Casket frames
24,714.61
Miscellaneous
3,143.72
During its fiscal year April 1, 1961 through November 30, 1961, World Woods' sales were as follows: Lumber core
$ 6,417.70
Casket frames
11,807.88
Miscellaneous
15,273.64 The manufacture of lumber core was terminated in early April 1961, and all sales of lumber core occurred prior to July 31, 1961. Old Dominion did not purchase any lumber core from World Woods after May 11, 1961. Old Dominion's total gross purchases of cores and miscellaneous items from World Woods during the period June 1960 through November 1961, were in the amount of $25,079.94. Of this amount, *199 approximately $7,000 represented purchases of miscellaneous items such as lumber, and the balance represented purchases of lumber cores. The following schedule shows the total cost of raw materials, that part of such cost of raw materials attributable to the cost of all types of core, and that part attributable to the cost of lumber core of Old Dominion Plywood Corporation during the calendar years 1959 through 1962: Year
Raw
Total
Lumber
Ended
Material
Core Cost
Core Cost
12-31-1958
$450,265.46
$192,153.11
$81,756.28
12-31-1959
511,340.56
236,765.93
68,160.97
12-31-1960
391,827.03
165,747.19
45,180.82
12-31-1961
334,772.99
140,818.52
31,894.42
12-31-1962
358,989.56
146,586.10
63,673.18
The following amounts were owed by Old Dominion to Cecil J. Stone, Sr., Cecil J. Stone, Jr. and W. A. Harkleroad as of December 31, of each of the years 1959, 1960, and 1961: 12/31/59
12/31/60
12/31/61
Cecil J. Stone,
Sr.
$36,110.29
$21,435.75
$21,435.75
Cecil J. Stone,
Jr.
6,600.00
7,440.00
7,440.00
W. A. Harkle-
road
6,450.00
6,665.00
6,665.00 These loans were recorded on interestbearing notes, and interest *200 was paid thereon by Old Dominion. The amount of the outstanding advances made by Old Dominion to World Woods was reduced in the months May to October 1961, by the assignment to Old Dominion of approximately $18,000 of accounts which were owed to World Woods by third parties. The bookkeeper at World Woods entered most of the amounts so assigned to Old Dominion as debit entries on the "Accts Payable - Old Dominion Plywood Corp." ledger sheet without specific direction from the Stones. In its income tax return for the year 1960, Old Dominion reported interest income from World Woods in the amount of $2,276.71. [5] The "Interest Paid" records of World Woods and the "Interest Received" records of Old Dominion indicate that during 1960, $1,112.50 of the interest paid Old Dominion was paid on dates corresponding to advances made by Old Dominion to World Woods. On its income tax return for the year 1961, Old Dominion reported interest income from World Woods in the amount of $9,689.26. The *201 records of both corporations indicate that of this amount, $8,908.58 was paid by the issuance of notes or additions to renewal notes by World Woods and $187.50 was paid on dates corresponding to advances made by Old Dominion to World Woods. The total amount of $144,964.29, claimed by Old Dominion as a bad debt deduction in 1961 includes the above-mentioned sum of $8,908.58. From 1946 through 1960, inclusive, Old Dominion showed a profit in each year of its operation. Net or taxable income of Old Dominion as reported on its income tax returns for each of the years 1952 through 1960, were in the following amounts: Year
Amount
1952
$34,822.26
1953
46,017.03
1954
61,469.43
1955
69,357.13
1956
49,854.65
1957
86,221.33
1958
31,419.28
1959
92,979.15
1960
78,670.11
The earned surplus of Old Dominion as of December 31, of each year, 1952 through 1959, as reported on its income tax returns, was as follows: Year
Amount
1952
$150,358.56
1953
177,950.00
1954
182,265.94
1955
220,686.58
1956
249,518.85
1957
295,776.89
1958
315,635.18
1959
364,844.14
During the period 1946 to 1962, no formal cash dividend was ever declared by *202 the board of directors of Old Dominion. No amount was ever paid by Old Dominion to its shareholders during that period which was intended by the directors to be a dividend. On its tax return for the calendar year 1961, Old Dominion reported a loss of $46,126.65. Total gross income of $243,390.46 was reported and deductions of $289,517.11 were claimed. Included in those deductions was an item, "Bad debts - $144,964.29." Opinion KERN, Judge: The principal question presented for our decision concerns the proper characterization of certain "advances" which petitioner Old Dominion Plywood Corporation made to World Woods Corporation during 1960 and 1961. A second issue relates to whether all or part of the above advances of funds constituted constructive dividends paid by Old Dominion to Cecil J. Stone, Sr., Cecil J. Stone, Jr., and W. A. Harkleroad. Petitioner Old Dominion argues that the advances which it made in its transactions with World Woods resulted in either a bad debt, or, in the alternative, in a business expense or business loss in the amount of $144,964.29, deductible in the year 1961. Respondent contends, with respect to the principal issue, that none of the advances *203 made by Old Dominion to World Woods created a bona fide debt between the corporations. He urges that the advances were in the nature of equity capital or of gifts. If we should find that the advances to World Woods did not constitute valid debts, we must then consider petitioner's alternative contentions concerning the deductibility of such advances as a business loss or as a business expense. The relevant criteria to be considered in determining whether amounts advanced to a corporation constitute bona fide indebtedness as opposed to capital contributions to the enterprise include the following: (1) The names given to the certificates evidencing the indebtedness; (2) the presence and absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" *204 money; (11) the ability of the corporation to obtain loans from outside lending institutions. Montclair, Inc. v. Commissioner, 318 F. 2d 38, 40; Wilbur Security Co., 31 T.C. 938, 948, affd. 279 F. 2d 657. No one of the above factors is controlling, and each case must be decided upon its own peculiar facts. John Kelley Co. v. Commissioner, 326 U.S. 521; Gooding Amusement Co., 23 T.C. 408, affd. 236 F. 2d 159; Emanuel N. (Manny) Kolkey, 27 T.C. 37, affd. 254 F. 2d 51. After a consideration of all these criteria and ascribing to each the weight which appears to us to be proper under the circumstances here present, we are of the view that the advances in question were not loans giving rise to business bad debts deductible under the pertinent provisions of the Internal Revenue Code. In reaching this conclusion we have been persuaded largely by the following considerations: The primary purpose of the organization and operation of World Woods to serve a necessary purpose of Old Dominion; for all practical purposes both corporations were controlled by the same individuals *205 and Old Dominion participated (at the least) in the management of World Woods; it was contemplated that the advances would be repaid not at all events but from the successful operation of World Woods' business; World Woods did not and could not obtain similar unsecured loans on its own credit from outside lending institutions; and the parties contemplated that other creditors of World Woods should be paid with a priority over Old Dominion as was in actuality done. (See Army Times Sales Co., 35 T.C. 688, 704.) Two of the factors stressed by petitioner are the reasonable debt-equity ratio originally contemplated for World Woods prior to the unforeseen operational difficulties which it subsequently encountered and the alleged fact that the advances (or at least many of them) were evidenced by interest-bearing notes with fixed due dates. We are inclined to view the criterion of the originally contemplated debt-equity ratio to be somewhat of a neutral factor in the present case. There is nothing so shocking about the ratio of the advances reasonably to be anticipated as necessary to the formal capital as to indicate strongly that the advances were not loans. However, it *206 must also be noted that these advances were contemplated by the parties as necessary at the very inception of World Woods in order for it to purchase the raw materials, inventories, and supplies required for its initial operation. Neither are we inclined to give much weight to the fact that interest-bearing notes with fixed due dates were given in evidence of many of the advances. While the fact that notes were executed is pertinent evidence, it is in no way determinative. Hattie Wolff, 26 B.T.A. 622. With regard to the fact that the notes provided for fixed due dates, it seems to us more significant that these provisions were uniformly and repeatedly disregarded. Each time one of the so-called notes became due and payable it was renewed for an additional period equal to that set out in the original note, apparently as a routine matter and without any specific action by the directors of Old Dominion. Thus, it cannot be said with any sense of reality that the instruments in question had such fixed maturity dates as to support materially a contention that the advances evidenced thereby were in truth and in fact loans. See Wilbur Security Company v. Commissioner, 279 F. 2d 657. *207 With respect to the interest terms of the instruments given by World Woods, the record indicates that 1,112.50 out of $2,276.71, the total interest reported by Old Dominion from these transactions in 1960, was entered on World Woods' books contemporaneously with advances made by Old Dominion. Although the books and records kept in the ordinary course of business are evidence of the transactions they purport to record, they are not conclusive. Doyle v. Mitchell Brothers Co., 247 U.S. 179; George G. Lynch, 31 T.C. 990, 998, affd. 273 F. 2d 867. In spite of the entries made in 1960 concerning interest paid to Old Dominion, we conclude that the contemporaneous advances from Old Dominion covering $1,112.50 of the 1960 interest indicate that such amount was either discount interest or interest with respect to prior advances paid out of the proceeds of a subsequent advance. Therefore, we believe that such "payments" in 1960 did not constitute such an actual transmittal of cash or other property to Old Dominion as to be considered a payment of interest in a sense that would materially support petitioner's position. With respect to the alleged *208 interest paid by World Woods to Old Dominion during 1961, the record discloses that out of a total of $9,689.26 reported by Old Dominion on its corporate income tax return as interest income arising from the advances made to World Woods, $187.50 constituted discount interest and $8,908.58 was accounted for by the issuance of additional notes or renewal notes by World Woods. For the reasons as stated above, we reach the same result with respect to these "payments" alleged to have been made in 1961. In determining whether the advances in issue constituted, for purposes of taxation, a valid indebtedness or an equity investment, a significant factor to be considered is "whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or were placed at the risk of the business * * *." Gilbert v. Commissioner, 248 F. 2d 399, 406. See also, Aqualane Shores, Inc. v. Commissioner, 269 F. 2d 116, 119, affirming 30 T.C. 519. It appears to us that the circumstances from the very beginning of the World Woods enterprise were such that reasonable expectation of repayment of the advances would necessarily *209 have depended upon the financial success of the venture. It is also apparent from the record that World Woods was unable to obtain unsecured loans on its own credit from any outside source. It is significant that the machinery commission agent and the discounting bank insisted that Old Dominion endorse the notes given by World Woods for the machinery purchased by it, even though they were secured by the machinery. The notes evidencing the $25,000 bank loan obtained by World Woods in October 1960 and renewed in January and April 1961 were required to be endorsed by Cecil J. Stone, Sr. Our conclusion that the advances by Old Dominion to World Woods were not loans but were in the nature of capital contributions is not precluded by the fact that Old Dominion itself did not own stock in World Woods. Sherwood Memorial Gardens, Inc., 42 T.C. 211, affd. 350 F. 2d 225; Foresun, Inc., 41 T.C. 706, affd. on this issue, 348 F. 2d 1006. Petitioner argues in the alternative that even if we conclude (as we have) that the advances from Old Dominion to World Woods were not bona fide debts, the total amount of the advances would still be *210 deductible as a business expense under section 162(a) of the 1954 Code [6] or as a business loss under section 165 of the Code. [7] Petitioner argues that it is entitled to an ordinary loss on the purchase and sale of stock or other forms of investment where the motivating force behind the transaction was a business, rather than an investment purpose. In support of this proposition, petitioner cites Bagley & Sewall Co., 20 T.C. 983, affd. 221 F. 2d 944; Tulane Hardwood Lumber Co., 24 T.C. 1146; Electrical Fittings Corporation, 33 T.C. 1026; and Booth Newspapers, Inc. v. United States, 157 Ct. Cl. 886, 303 F. 2d 916. *211 Respondent, on the other hand, urges that the above-cited "source of supply" cases are distinguishable from the instant situation because (1) Old Dominion did not have to advance funds to World Woods as a prerequisite to securing lumber core; (2) the equity interest of Old Dominion in World Woods was unmarketable and bore no relation to the amount of core needed by Old Dominion; (3) Old Dominion continued to hold onto the instruments recording the advances and made no attempt to sell them; and (4) Old Dominion was, in effect, the only contributor to the financial structure of World Woods. Because of these alleged distinguishing factors, respondent argues that the equity interest which Old Dominion owned in World Woods was a capital asset, and therefore the loss from its subsequent worthlessness is a capital loss pursuant to the provisions of section 165(g) of the 1954 Code. [8]
*212 In order to determine whether an item of property constitutes a capital asset in the hands of a particular taxpayer, we must look to the provisions of section 1221 of the 1954 Code. [9] Because this section defines "capital asset" in essentially a negative manner, the courts have developed many of the guideposts in this area. In the case of Corn Products Co. v. Commissioner, 350 U.S. 46, the Supreme Court observed at page 52: * * * Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than as capital gain or loss. The preferential treatment provided by § 117 [of the 1939 Code and predecessor of section 1221 of the 1954 Code] applies to transactions in property which are not the normal source of business income. * * * *213 The cases upon which petitioner relies have applied the approach taken by the Supreme Court in Corn Products insofar as they have examined individual transactions as to whether they fit within "the everyday operation of a business" or are apart from "the normal [sources] of business income." The theory of these cases, which all involve situations wherein a taxpayer purchased stock or securities in a particular corporation in order to procure raw materials or inventory, is that such a purchase does not constitute a mere investment but is an integral part of the operation of the taxpayer's business. As we stated in Electrical Fittings Corporation, supra at 1031: The tax treatment of the loss on the sale of the * * * stock depends on the purpose for which the petitioner acquired the stock. Stock purchased as an investment is a capital asset; when sold, it creates capital gain or loss. But stock purchased in the ordinary course of business where the only purpose is to insure a vital source of inventory is not a capital asset, and the loss upon its sale is deductible from ordinary *214 income. * * * Respondent's contentions with respect to this issue are essentially those set out in Rev. Rul. 58-40, 1958-1 C.B. 275. They are that in order to fit within the rule of the "source of supply" cases, the capital interest purchased must be a minority one, that the objectives for which the stock or securities are obtained are such that they can be accomplished and the stock or securities disposed of within a short time after their acquisition, and that the capital interest purchased should bear some relation to the amount of material needed by the purchaser. We do not feel that because the decided cases to date have involved situations wherein the taxpayer has purchased a minority capital interest in an already established source of supply (where the capital interest would more likely be marketable), petitioner is foreclosed thereby from coming within the theory of the cases it has cited. While the acquisition by one corporation of a high percentage of controlling interest in another corporation and the retention of that interest for a considerable length of time tend to suggest that the acquiring corporation may have had investment motives, these two facts *215 by themselves are not dispositive of the question. Rather, the fundamental inquiry should be whether the particular securities were purchased as an integral and necessary action in the conduct of the taxpayer's business or whether an investment purpose can be found to have motivated the transaction. Booth Newspapers, Inc. v. United States, supra, at 921. In the instant case, we are convinced that the petitioner, Old Dominion Plywood Corporation, was not motivated by any investment purpose in making the advances to World Woods. We believe that Old Dominion needed a local source of lumber core which could be responsive to its specific requirements and provide rapid delivery. The decision to aid in the development of a local source came only after petitioner's previous source of core had become unavailable. We do not feel that the fact that three of Old Dominion's shareholders were the only shareholders of record of World Woods indicates that petitioner did not have to advance funds to World Woods in order to secure lumber core. As we have stated, the need was for a local source of supply, and since the officers and directors of Old Dominion were reasonably convinced *216 that there was no dependable local source in existence in 1960, the enterprise had to be established from the very beginning with an amount of money commensurate with such a program. Absent the advances from Old Dominion, the creation of a local source of supply such as World Woods could never have been commenced. Moreover, we believe that the length of time that petitioner Old Dominion held the equity interest in World Woods was not unreasonably long in view of the fact that the problem of securing a reliable local source of lumber core continued to exist throughout the taxable years in question. Booth Newspapers, Inc. v. United States, supra at 922. Cf. Gulftex Drug Co., 29 T.C. 118, affd. 261 F. 2d 238. The record indicates that petitioner Old Dominion held an equity interest in World Woods from June 1960 until the dissolution of World Woods in November 1961, a period of 17 months. This does not compare unfavorably with the 4-year holding period in Tulane Hardwood Lumber Co., supra, and the 6-year holding period in Booth Newspapers, Inc. v. United States, supra. Finally, we are not persuaded that petitioner *217 had an investment motive in making the advances either because petitioner Old Dominion contemplated the purchase of only 10 percent of World Woods' core production or because the latter also sold casket frames. The fact that Old Dominion was only able to absorb 10 percent of World Woods' production does not imply that its business purpose was to invest in a core production enterprise. The economics of the situation dictated that in order to produce the lumber core needed by Old Dominion in a financially successful manner, World Woods would have to be capable of producing 10,000 to 12,000 square feet of lumber core per day and would have to sell to other customers the excess of such production over that required by Old Dominion. The selling of casket frames in the amounts of approximately 24 percent and 33 percent of the total sales for the fiscal years 1960 and 1961, respectively, was due to the purchase of casket frame inventory by World Woods from Virginia Woodworking at the beginning of the former corporation's existence. This acquisition was made only to provide World Woods with some activity until the full line of machinery could be installed. The higher percentage for fiscal *218 year 1961 can be attributed to the fact that the manufacture of lumber core was terminated by World Woods in early April 1961. We do not think that this limited activity in an area related to lumber production indicates that petitioner's advances to World Woods were not related to the creation of a "source of supply." However, the record indicates that by late February 1961, it was concluded by Old Dominion that World Woods would have to be dissolved. Despite this conclusion, a total amount of $53,700 was advanced by Old Dominion to World Woods during the period March 21 to October 19, 1961. These were made at a time when it was clear that there was no possibility of World Woods becoming a source of supply for petitioner. We find that such amount of the total advances cannot constitute an ordinary business expense or business loss deduction under the "source of supply" theory in view of the fact that during this period there was no relation between the advances and the development of a source of supply in World Woods. See Edward Koppelman, 27 T.C. 382, 390. With regard to these amounts advanced on and after March 21, 1961, the record indicates that these payments *219 were made at a time when the parties were well aware of the ultimate failure and eventual dissolution of World Woods. There can be no doubt that such payments were unrelated to the establishment of a source of supply. Such payments were not so compulsory or essential to the continued conduct of petitioner's business as to merit deductibility as an ordinary and necessary business expense or as a business loss. A. Giurlani & Bro. v. Commissioner, 119 F. 2d 852, affirming 41 B.T.A. 403. There is no evidence in the record that these latter advances were made to retain, protect, or promote Old Dominion's established business. Cf. Cubbedge Snow, 31 T.C. 585, and cases cited therein. Moreover, Old Dominion's proprietary interest in World Woods did not arise out of any activity similar to that which an investment company might make. Cf. Alleghany Corporation, 28 T.C. 298. In view of our conclusion with respect to the equity-like nature of the advances to World Woods generally, and in the absence of the applicability of the "source of supply" theory to the post-March 21, 1961 advances, we conclude that the loss occasioned by these latter *220 advances were capital losses. A. Giurlani & Bro. v. Commissioner, supra; H. William Ihrig, 26 T.C. 73, 76. Respondent further argues that certain offsetting items must be applied against the allowable deduction for the advances. These items involve the fair market value of the machinery taken over by Old Dominion, an alleged 10 percent credit on post-March 17, 1961 purchases from World Woods that should have been taken by Old Dominion, and the amount of $8,908.58, the interest "paid" by World Woods in 1961 by means of the issuance of notes or additions to renewal notes. Respondent contends with respect to the interest items of $8,908.58 that such amount was not genuine interest since it was paid with notes which were worthless at the time they were given. We are in accord with petitioner's position concerning this item to the effect that since Old Dominion reported such amount as interest income in 1961, inclusion of the $8,908.58 in the 1961 deduction cancels out the item. With regard to the 10 percent credit item, respondent contends that post-March 17, 1961 purchases of Old Dominion from World Woods amounted to $10,864.90 and that no 10 percent *221 credit was applied against the amount outstanding pursuant to the May 1, 1960 agreement. We are in accord with the petitioner's position that the claiming of this credit would have no effect upon the loss sustained by Old Dominion. Because the applicable credit of $1,086.49 was not claimed, it was still part of the assets of World Woods at the time of the takeover of the corporation by Old Dominion. Therefore, when Old Dominion took possession of all the assets and assumed all the liabilities of World Woods, this amount of $1,086.49 was then available to be applied against the amount of the outstanding advances. Respondent's final adjustment concerns the $66,396 figure at which Old Dominion took over the machinery of World Woods in September 1961. He urges that the machinery was worth between $90,000 and $100,000, and the difference between the fair market value that we find as of that date and the takeover figure should be applied against the allowable loss. In support of this contention, respondent points out that essentially all the machinery was sold for a total of $67,300 during 1962, 1964, and 1965, throughout a period extending well beyond the years before us. Respondent reasons *222 that because the machinery was sold at an amount greater than the takeover value at a time when it was much older, the fair market value at the time of its acquisition by Old Dominion must have been much higher than $66,396. The record indicates that shortly before Old Dominion took over the machinery, Brooks offered to pay approximately $95,000 for it, less the unpaid balance of the original purchase price. However, when World Woods transmitted its willingness to accept the offer, Brooks withdrew the offer. World Woods then offered to sell the machinery to Brooks for $68,000, the amount representing the unpaid balance of the notes outstanding, but this offer was not accepted. After an advertising campaign in August 1961 failed to produce any prospective purchaser, Old Dominion decided to take over the machinery. The fact that the machinery was sold over a subsequent 4-year period for a total amount approximately equal to the figure at which Old Dominion acquired it is pertinent to our consideration of the machinery's fair market value as of September 1961. Our findings with respect to the net amounts realized from the sale of the machinery indicate that almost half of it was sold *223 within one year of the takeover and over 90 percent was sold within three years thereof. Moreover, it is obvious that these were arm's-length transactions, since petitioner Old Dominion was attempting to realize the maximum amounts through these sales. While these sales were made during a period subsequent to the time at which we must determine fair market value, the record does not disclose that there was a material difference between the fair market value of this equipment as of September 1961 and during the period of the sales. The assets in question were heavy machinery of a relatively long useful life, which had been subjected to very little use and which had been placed in dead storage during the period from the dissolution of World Woods until its sale. We regard these sales as much more accurate evidence of the machinery's fair market value than the initial offer of Brooks, which was withdrawn immediately upon World Woods' attempt to accept it. In the light of these observations and the evidence in the entire record, we conclude that the fair market value of the machinery in question as of September 1961 was the amount contended for by petitioner, $66,396. See Philip Kaplan, 43 T.C. 663. *224 We turn now to the issue raised by the deficiencies determined against the three individual petitioners herein. Respondent determined that the total net amount of the advances made by Old Dominion to World Woods constituted dividends, under section 316(a) of the 1954 Code, [10] to Cecil J. Stone, Sr., Cecil J. Stone, Jr. and W. A. Harkleroad in amounts corresponding to the percentage of stock each held in Old Dominion. Respondent contends that the primary purpose for the advances was to benefit the three shareholders of World Woods. Since a total of 91 percent of the outstanding stock of Old Dominion was owned among the three, respondent determined that the proportionate share of the advances which was dividend income to the above-named petitioners was 69/91, 16/91, and 6/91, respectively. *225 We will state at the outset that because of our holding that the advances made prior to March 21, 1961, constituted a business loss deduction to Old Dominion under the "source of supply" doctrine, the total amount that can possibly be classified as a dividend distribution is limited to $53,700, the sum advanced during the period March 21 to October 19, 1961. Respondent's contention with respect to all of the advances is that they should be considered as having been made for the personal benefit of the three individual petitioners who were shareholders of World Woods, despite the fact that the funds were not directly transmitted to them. It is clear that a corporate distribution can be attributed to a particular individual if it is expended for his personal benefit, see Challenge Manufacturing Co., 37 T.C. 650, or in discharge of his personal obligation. Wall v. United States, 164 F. 2d 462; Edgar S. Idol, 38 T.C. 444, affd. 319 F. 2d 647. However, in this case, we believe that the characterization of these advances as dividends *226 to the three individual petitioners merely because they were transmitted to a corporation in which they were shareholders would not give proper recognition to the separate identity between World Woods and its shareholders nor would it be consonant with the reasons for these advances set forth in our findings, supra. In view of the independent business activity of World Woods, its incorporation under the laws of the State of Tennessee, and the absence of sham, it remains a separate taxable entity. National Carbide Corp. v. Commissioner, 336 U.S. 422; Skarda v. Commissioner, 250 F. 2d 429, 434, affirming 27 T.C. 137. The record discloses that the post-March 21, 1961 advances were made to pay the remaining liabilities of World Woods in expectation of its ultimate dissolution. These advances were made for the ultimate purpose of avoiding the involuntary bankruptcy of World Woods or a foreclosure of its assets by prolonging its corporate existence, and in the hope of minimizing losses by Old Dominion which appeared inevitable by reason of its financial support of World Woods, including its endorsement of the notes of World Woods to Brooks. While *227 a prudent appraisal of the situation as of March 21, 1961, might have been that such hopes were futile, the advances were nevertheless continued with these expectations until October 1961. However, there could have been no hope, much less any expectation, that the formal stockholders of World Woods could possibly receive any recovery on their investments, regardless of how the liquidation of World Woods was accomplished. While the petitioners may have been concerned primarily with the minimization of the ultimate liability of old Dominion on the notes to Brooks which it had endorsed, they could not have failed to consider the fact that the immediate purpose of most of these advances was to permit World Woods to pay off its creditors so that no creditor could force a liquidation of World Woods' assets under circumstances which would result in a minimal realization of their value. Among creditors of World Woods was the First National Bank of Bristol to which World Woods was indebted on a $25,000 note guaranteed by Cecil J. Stone, Sr. The same reasoning that led to the post-March 21, 1961 advances by Old Dominion must have made it apparent to all of the petitioners that if this note *228 was not paid by World Woods and the Bank took action thereon, which would have resulted in a forced liquidation of the assets of World Woods, the Bank could have collected from World Woods only a minimal amount of its claim, and Cecil J. Stone, Sr., would have been personally liable to the Bank as guarantor. We cannot escape the conclusion that one of the reasons which motivated at least a part of the advances by Old Dominion (i.e., the $25,000 advance on July 17, 1961, which permitted the payment on the same day of World Woods' note to the Bank) was to discharge the liability of Cecil J. Stone, Sr., as guarantor of such note. With the exception of the endorsement by Cecil J. Stone, Sr., of the $25,000 note due the First National Bank of Bristol, no other liabilities of World Woods were guaranteed by any of its shareholders. Consequently, no personal obligation of the shareholders was discharged as a result of the advances made by Old Dominion apart from the $25,000 liability of Cecil J. Stone, Sr., as an endorser. On July 17, 1961, when World Woods paid this $25,000 on the note, it is clear that it did not have sufficient funds of its own at that time to make such a payment. Since *229 Old Dominion advanced the identical sum to World Woods on this date, we are persuaded that Old Dominion, in fact, assumed the payment of this obligation, which otherwise would have become the responsibility of Cecil J. Stone, Sr. We find such corporate discharge of the personal liability of a shareholder to be a dividend to the extent of the availability of sufficient earnings and profits. Wall v. United States, supra.
With respect to the remaining advances and their possible dividend consequences to the shareholders, we cannot sustain respondent's determination. No personal obligations of any of Old Dominion's shareholders were discharged as a consequence of these advances, and we conclude that no individual economic benefit accrued to them thereby. Holsey v. Commissioner 258 F. 2d 865, 868; Niederkrome v. Commissioner, 266 F. 2d 238; Milton F. Priester, 38 T.C. 316, 329. We cannot accept respondent's analysis of the transaction apart from the $25,000 discharge of Cecil J. Stone, Sr.'s liability) because these advances to World Woods were not made for the personal benefit of its shareholders but were rather capital outlays *230 made by Old Dominion to a corporation which it previously hoped would constitute its source of supply. Nor can we conclude that the value of their equity in World Woods was in any way increased on account of these advances or that they received any tangible benefit therefrom, since they were made with the expectation of the dissolution of World Woods and upon that dissolution, none of the shareholders received or could anticipate receiving any distribution in liquidation. The record reveals that Old Dominion had not declared a formal cash dividend during the period 1946 to 1962 and that its accumulated earnings and profits during 1962 were sufficient to cover the $25,000 paid in discharge of the liability of Cecil J. Stone, Sr. Hence, we find that this payment is taxable as a dividend to him. Although this $25,000 advance to World Woods which was used to pay the Bank was evidenced by an interest-bearing note of World Woods to the order of Old Dominion, it is apparent to us, for the reasons heretofore stated, that such advance was not a bona fide indebtedness. It is well settled that *231 a distribution of corporate earnings and profits to stockholders or even one of several stockholders may constitute a dividend despite the fact that it is not proportionate to stockholdings. Barbourville Brick Co., 37 T.C. 7, 13. Petitioners' contention that the motive for the payment of the $25,000 note to the First National Bank of Bristol was to prevent Cecil J. Stone, Sr., from bringing any action thereon which would force an involuntary liquidation of World Woods is without merit and contrary to the record herein. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Cecil J. Stone, Sr. and Edna M. Stone, Docket No. 210-64; Cecil J. Stone, Jr. and Dorothy C. Stone, Docket No. 211-64; and Walter A. Harkleroad and Mary E. Harkleroad, Docket No. 212-64.↩
1. In 1960 Old Dominion Plywood Corporation sought and received permission from the Virginia State Corporation Commission to cancel the 1,000 shares of preferred stock held in the treasury of the company and to reduce the capital of the corporation by $100,000 (the stated capital represented by these shares) and to amend the charter of the corporation so as to eliminate the preferred stock and to increase the authorized capital stock to 15,000 shares of the par value of $50 each in lieu of the existing authorized common stock of 1,000 shares of no-par value. Thereafter, in 1960, the corporation called in all of its outstanding no-par shares, and in exchange for each share issued seven of the new $50 par shares. The old no-par issue was cancelled and the outstanding capital stock of the corporation was increased from $50,000 to $350,000. Because of this increase in the capital stock account of Old Dominion, the earned surplus account was recorded on the books of the corporation at figures of $106,604.70 and $59,271.71 on December 31, 1960 and December 31, 1961, respectively.↩
2. Old Dominion purchased approximately $30,000 to $40,000 worth of lumber cores annually from the Virginia Woodworking Company during the late 1950's.↩
3. These were the following: ↩
January 9, 1961
$10,000
January 27, 1961
2,500
February 3, 1961
$ 2,500
July 17, 1961
25,000
4. Both petitioner Old Dominion and respondent aver that the amount of $4,368.59 was included in the total amount of $9,689.26, reported on Old Dominion's 1961 income tax return as interest income. However, an examination of page 1, line 6 entitled "Other interest" of that return, a photostatic copy of which was admitted in evidence, reveals an entry of $11,943.78. There is nothing in the record to explain this variance.↩
5. The "Interest Paid" ledger sheet of World Woods indicates that the total amount of interest paid Old Dominion in the year 1960 was $2,276.61. Nothing in the record explains this discrepancy.↩
6. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; (2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. * * *↩
7. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; * * *↩
8. SEC. 165. LOSSES. (g) Worthless Securities. - (1) General Rule. - If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. (2) Security Defined. - For purposes of this subsection, the term "security" means - (A) a share of stock in a corporation; (B) a right to subscribe for, or to receive, a share of stock in a corporation; or (C) a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form. (3) Securities in Affiliated Corporation. - For purposes of paragraph (1), any security in a corporation affiliated with a taxpayer which is a domestic corporation shall not be treated as a capital asset. For purposes of the preceding sentence, a corporation shall be treated as affiliated with the taxpayer only if - (A) at least 95 percent of each class of its stock is owned directly by the taxpayer, and (B) more than 90 percent of the aggregate of its gross receipts for all taxable years has been from sources other than royalties, rents (except rents derived from rental of properties to employees of the corporation in the ordinary course of its operating business), dividends, interest (except interest received on deferred purchase price of operating assets sold), annuities, and gains from sales or exchanges of stocks and securities. In computing gross receipts for purposes of the preceding sentence, gross receipts from sales or exchanges of stocks and securities shall be taken into account only to the extent of gains therefrom. * * *↩
9. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; (3) a copyright, a literary, musical, or artistic composition, or similar property, held by - (A) a taxpayer whose personal efforts created such property, or (B) a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property; (4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or (5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.↩
10. SEC. 316. DIVIDEND DEFINED. (a) General Rule. - For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders - (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.↩